**Frank Lester BROCK, Appellant,**
v.
**UNITED STATES of America,**
Appellee.
No. 15322.

United States Court of Appeals
Fifth Circuit.
June 28, 1955.

**682**

Hal S. Ives, West Palm Beach, Fla., Russell H. McIntosh, West Palm Beach, Fla., of counsel, for appellant.

James L. Guilmartin, U. S. Atty., Anthony S. Battaglia, J. Edward Worton, Asst. U. S. Attys., Miami, Fla., for appellee.

Before HUTCHESON, Chief Judge, JONES, Circuit Judge, and WRIGHT, District Judge.

WRIGHT, District Judge.

Appellant was convicted under an indictment in six counts charging violation of the Internal Revenue laws relating to moonshine liquor. He contends that his conviction resulted from evidence obtained in an illegal search of his premises in violation of the Fourth Amendment,[1] and by admission in evidence of statements made by him, while asleep, in vio-

---

1. .The Fourth Amendment reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

lation of the Fifth Amendment.[2] For the reasons hereinafter stated, it was error to admit the evidence in question, the error was prejudicial, and the conviction must be set aside.

On December 28, 1953, William R. Thompson, a federal revenue agent, along with other agents, discovered an illicit still set up and in complete operation about a quarter of a mile off Florida State Road No. 7, near the line which separates Dade County from Broward County. The officers made an inspection of the area and observed a house a quarter of a mile from the still on Florida State Road No. 7. At or about the house they observed a 1942 Ford automobile, the appellant, Frank Lester Brock, Grover Cleveland Peoples and Clarence Bacon. A short time later Peoples and Brock were seen in the Ford, driving down a dirt road which ran parallel to a lane which ran east of State Road No. 7 and passed within 25 or 30 yards of the still site. The still was in a heavy clump of trees, and was not visible from the dirt road. The dirt road continued past the still site a short distance to a place where men were dredging a canal. After Brock and Peoples were seen driving down the dirt road, they were seen by the officers in the same automobile on the opposite side of the canal driving on a similar type road. Later they were observed returning to the house. Shortly thereafter Bacon was seen in the same automobile going down the dirt road near the still site. That evening the revenue agents returned to the still site and discovered that men were working at the still. From what he saw and heard, Thompson assumed they were having difficulty with the blower, a part of the still setup. The men at the still were not identified. By the time the revenue agents were in position to raid the still, the men had gone. The agents were unable to see in which direction they left.

The following morning, December 29, 1953, the revenue agents returned to the still site. At about 7:15 A. M., Peoples, Bacon and one Brisbon were seen walking down the dirt road. They came from the general direction of the house on State Road No. 7 and went into the clump of bushes or trees where the still was located. They came out of the side of the clump opposite their point of entering, and returned to the still site with a number of five-gallon jugs. A short time later, all three men, Brisbon, Peoples and Bacon, started away from the still site in the general direction of the house on State Road No. 7. As the three men left the still site, Thompson rose up from his hiding place and arrested them.

After the arrest of Brisbon, Peoples and Bacon, Thompson and the other agents, without a warrant of any kind, went to the house on State Road No. 7 for three purposes, as stated by Thompson: (1) to determine whether or not Brock, the appellant, was there, (2) to question him, (3) in the event it appeared from the questioning that he was connected with the still, to arrest him.

After the officers entered the yard of the house through a fence which had been previously knocked down, they saw the Ford automobile they had seen the previous day. Thompson looked in the window of the car and saw a number of apparently empty five-gallon glass jugs. Thompson then knocked on the back door of the house. There was no response. He then walked around to the south side of the house where he saw an open window. Standing alongside it, he looked into the house and saw an unidentified man sleeping on a bed. Thompson then went to the front of the house and knocked. Again getting no response, he returned to the open south window where he knocked and called aloud. According to Thompson, "Finally, the man who was asleep on the bed or cot, who was Frank Brock, rose up partially and said, 'go away, don't bother me.' It was apparent that he was in a state of heavy sleep, or up until that time was." Thompson

2. The part of the Fifth Amendment here involved reads:

"No person * * * shall be compelled in any criminal case to be a witness against himself."

further testified that the appellant was never awake at any time "until after I went into the house and shook him." Nevertheless, the following conversation took place between Thompson, from his position outside the window, and the sleeping appellant in bed inside the house:

"Thompson: Come down to the still and help us.

"Brock: No, I am not going down there today.

"Thompson: We are having trouble getting the blower to work. Come and help us fix it.

"Brock: You * * *, wouldn't help me last night, and I am not going to help you today. You * * * wouldn't help me last night and I am not going to help you today."

After the conversation, the agents entered the house, Thompson shook Brock until he was awake, and placed him under arrest. Subsequent to arrest, the agents searched Brock's person, his personal effects, and the entire house. They found in his pocket, in his wallet, and in the dresser by the side of the bed where he was sleeping, numerous private and personal papers of evidentiary value, indicating his connection with the operation of the still. They also found in the house the remains of copper and solder which had apparently been used in making parts for the still. Over the objection of appellant, and after denial of a motion to suppress, the private papers, the copper, the solder and the conversation while asleep were admitted in evidence.

■ Before undertaking an analysis of appellant's rights under the Fourth and Fifth Amendments, in order to put the matter in proper perspective, it may be well to refer again to the basic principles which underlie these rights. First of all, the right to protection against unreasonable search or seizures and compulsory self-incrimination belongs to the guilty as well as the innocent. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153. Unless courts are prepared to enforce these rights and protect those charged with crime, irrespective of their obvious guilt, they condone illegitimate and unconstitutional practices which, if long adhered to, may result in a breakdown of the protection accorded free men by the Fourth and Fifth Amendments.[3] This course, like the enforcement of other parts of the Bill of Rights, may often afford a shelter for criminals, "But the forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self respect. They may have overvalued privacy, but I am not disposed to set their command at naught."[4]

It must be remembered that the Bill of Rights, of which the Fourth and Fifth Amendments are a part, was incorporated in the Constitution in an effort to give the courts of this country the authority, in James Madison's immortal phrase, "to oblige the government to control itself."[5] Concentrations of power,

. Boyd v. United States, 116 U.S. 616, at page 635, 6 S.Ct. 524, at page 535, 29 L.Ed. 746 reads:

"* * *. It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. * * *"

. Mr. Justice Jackson, dissenting, in Harris v. United States, 331 U.S. 145, 198, 67 S.Ct. 1098, 1120, 91 L.Ed. 1399.

. See Hutcheson, Law and Liberty Reconciled: The Principle of Our Free Society, The Spirit of Its Laws, 1953.

however benign in inception, historically have led to despotism, and compulsory self-incrimination through the unreasonable search of a man's home is the act of a despot. " '* * * it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom.' " Counselman v. Hitchcock, 142 U.S. 547, 581, 12 S.Ct. 195, 205, 35 L.Ed. 1110. "Nor should we forget that what seems fair enough against a squalid huckster of bad liquor may take on a very different face, if used by a government determined to suppress political opposition under the guise of sedition." [6]

Approaching this case from the background of the above principles, we find federal agents, after observing an illicit still for two days, making a raid without first attempting to obtain a search warrant,[7] and then proceeding to a house one quarter of a mile away on a public road from whence they thought the persons arrested in the raid had come. Knowing they could not, on the basis of the information then available to them, obtain a search warrant for the house,[8] they determined to obtain additional evidence so that they could search the house, allegedly as an incident to a lawful arrest, for which a warrant was also lacking.

■ To begin with, the agents, when they appeared outside Brock's bedroom window, were in violation of his rights under the Fourth Amendment. Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his "right to be let alone" [9] as guaranteed by the Fourth Amendment. McDonald v. United States, supra.[10]

■ But the agents were not satisfied with merely violating the appellant's right under the Fourth Amendment. They determined to destroy his rights under the Fifth Amendment as well by obtaining from him, while asleep, self-incriminatory answers to suggestive questions propounded by themselves. Evidence obtained at the end of a whip is no less voluntary than that derived by insidious and more subtle means where the opportunity to exercise the right against self-incrimination is absent. Before a man can be compelled to testify against himself, he must have a fair chance to exercise his right under the Fifth Amendment. Where that fair chance is not afforded him, evidence obtained in violation of his right is not only not admissible against him, but it is incapable of becoming the foundation for the violation of his rights under the Fourth Amendment. Freedom from unreasonable search would be a delusion indeed, if evidence obtained through compulsory self-incrimination may be used as a basis for violating that right.

■ It was error, therefore, to admit in evidence the statements made by appellant while asleep. It was error also to admit the evidence obtained by the

6. Judge Learned Hand in United States v. Kirschenblatt, 2 Cir., 16 F.2d 202, 203, 51 A.L.R. 416.

7. United States v. Lefkowitz, 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877, reads:
"* * * the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests. Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime. * * *"

8. See Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

9. Mr. Justice Brandeis, dissenting in Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944.

10. In McDonald v. United States, supra, the arrest of defendant and search of his room in a rooming house based on evidence obtained by looking through a transom held in violation of Fourth Amendment.

agents in searching appellant's house. This is particularly true with reference to the private papers of evidentiary value only found in appellant's pockets, wallet and dresser drawer. Private papers of evidentiary value alone and not part of the agency of crime are not admissible in evidence as against the Fifth Amendment, even where the Fourth Amendment has not been violated. United States v. Lefkowitz, supra; Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647.

Appellant's final contention is that had the inadmissible evidence been excluded, as we herein hold, there remains no basis for submission of this case to the jury. That issue was not raised below and we do not pass on it here. All we hold is that the evidence obtained in the search of the house and the admissions of appellant while asleep should not have been admitted in evidence, that the admission thereof was prejudicial and that the conviction must be set aside.

Reversed.