**Landon Culver DAILEY, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 41485.**

Court of Criminal Appeals of Texas.

Sept. 16, 1968.

Rehearing Denied Nov. 6, 1968.

Second Rehearing Denied Dec. 11, 1968.

McClain & Stump, by W. K. McClain, Georgetown, for appellant.

Timothy G. Maresh, County Atty., W. H. Connor, Asst. County Atty., Georgetown, and Leon B. Douglas, State's Atty., Austin, for the State.

OPINION

WOODLEY, Presiding Judge.

The offense is seriously threatening to take a human life (Art. 1265 Vernon's Ann. P.C.); the punishment, 30 days in jail and a fine of $300.00.

The grounds of error upon which reversal is sought are (1) The evidence is insufficient to sustain the conviction and (2) the court erred in not giving one or all of appellant's Special Requested charges, and especially in not charging on the law of self-defense.

The information alleged that on or about the 22nd day of March, 1967, appellant did seriously threaten to take the life of N. W. Autrey. The state's evidence reflects that Mr. Autrey, a Texas Highway Patrolman, was called to Round Rock to investigate a motor vehicle accident in which a pickup truck side-swiped a guard post on the south end of the overpass on old U.S. Highway 81 in Round Rock.

There was blood on and around the steering wheel of the pickup and on the pavement and down the embankment. The pickup was identified as belonging to appellant and his license to drive was strapped to the steering column.

Automobile mechanic Johnnie Roepke, who was also Constable of the precinct, had recognized the pickup as that of appellant and moved it off the overpass "to make sure no one else had an accident on the bridge" before Patrolman Autrey arrived.

Appellant's nephew, Jerry Miles, was at the pickup when Constable Roepke arrived and "was flagging traffic until we got the vehicle off the bridge."

Having checked the scene and the pickup, Patrolman Autrey, accompanied by Constable Roepke, conducted a search for appellant or the driver of the pickup which finally led them to appellant's home.

The Constable testified:

"Q. Well, what did you do, then? Where did you go? I believe you stated you had seen him at his house. When was that?

"A. That was, this was about the last place we had gone to. We had looked all over what we call the branch, south of Round Rock, thought the man had drifted off to a lower part of the bushes, probably got down and couldn't get up. We just had anything in mind could have happened from—

"Q. Why?

"A. Well, we just looked for the man. We figured he was hurt, there was blood. We didn't know what might have happened, didn't know where he went to, didn't know but what he might get down and it was getting late in the afternoon, and we were determined to find the man if he was in the thicket down there, get him. Needed help.

"Q. You say you then went to his house?

"A. That was the last place we went to."

The officer's version of what occurred at appellant's home was that they went up on the porch, saw appellant lying on the couch in his home, turned around and started to leave. While they were in the yard appellant's nephews Jerry Miles and James Buckner, drove up and went into the house and the officers followed. Appellant was lying on the couch, apparently asleep. He had a small abrasion type wound at the top of his nose and there were blood spots down the front of his jacket and on his left shoe. The two nephews shook appellant awake and informed him that the officers were there and wanted to talk with him about the accident.

Appellant wanted to know what charges would be filed. Patrolman Autrey told him that he did not know what, if anything, would be filed because the investigation was not complete. Appellant then became belligerent "cursing very loudly, using all sorts of abusive language," and called Patrolman Autrey a "G—— d—— S.O.B."

Appellant's nephew Miles asked if he could take appellant to a hospital, stating that he thought appellant needed to go see a doctor or go to a hospital for treatment "of whatever might be wrong with him."

Patrolman Autrey advised Miles that he was welcome to do so. When Miles spoke to appellant about taking him to a hospital, appellant became enraged and began shouting and cursing, saying that nobody was going to take him to any G—— d—— hospital or doctor.

The officers then decided to leave and go to the Justice of the Peace's office. Patrolman Autrey asked Mr. Miles, in appellant's presence, if he didn't think it would be wise for them (his nephews) to take appellant to the Justice of the Peace, whereupon appellant said "Yeah. I'll go up to the G—— d—— judge's office or anywhere else you want to go, but no hospital or doctor."

The officers walked out of the house followed by appellant and his nephews. As appellant was coming down the steps, Patrolman Autrey, who had walked out in the yard, reached out to hold appellant's arm to keep him from falling, at which time appellant told the Patrolman to keep his G—— d—— hands off him, and threatened to kill Autrey if he touched him.

According to the testimony of the officers, Patrolman Autrey went to his car and the nephews helped appellant into the street and put him into Autrey's car, after asking the officer if it would be all right.

The evidence shows that appellant continually cursed Patrolman Autrey while he was in the yard and on the way to the office of the Justice of the Peace in Round Rock, where Patrolman Autrey filed complaints against appellant for disturbing the peace and for driving a motor vehicle while intoxicated.

The threats which the state relied upon were those made by appellant after the warrant issued on the complaint against him for drunk driving in the office of the Justice of the Peace and on the way to Georgetown, the County Seat, and included: "I'll kill you, you S.O.B."; "I'm going to kill you, I promise you that"; "You've got me shackled now, but I'll get you"; "I'm going to kill you by putting a bullet right between

your eyes." Also, when he wanted the Patrolman to "dismiss all the old, bad charges on him, just forget it," and Autrey told him he couldn't do that, appellant then said "You G—— d—— S.O.B. I gave you your chance, but now I'm going to kill you," and threatened to kill Autrey's wife and his family.

Appellant's nephew Miles did not testify nor was he present at the trial. James Buckner, the other nephew of appellant, gave a somewhat different account of the events which occurred after he and his half-brother Miles arrived at appellant's home and woke him up.

According to the witness Buckner appellant was asleep and Patrolman Autrey told him and his brother to wake him up; that Mr. Autrey said that appellant was going to have to come with him to the Justice of the Peace and told appellant to get up and arrange his clothing and to come on. When he asked Mr. Autrey if he had a warrant, Autrey said he did not and insisted that appellant was going to have to come with him "for disturbing the peace there in the house," and that he and his brother helped appellant out and put him in the car because they could handle him better than the officers could and were afraid they were going to hurt him.

All of the evidence was to the effect that appellant was drunk. He testified that he drank some beer and whiskey, more than he should have, and was drunk in his home and "was drug out" and that he had a faint memory of what happened in the house. He further testified:

"Q. What part of it could you tell?

"A. All I can remember that they came in the house, the officer caught me by the arm. I was drug out and I was drunk and I don't deny cursing. In fact, did not know. I was drunk. And if I made a threat, I might have threatened his life, I don't know but I didn't—there was no meaning there. It was drunk

talk. In fact, I couldn't pick out the officer and I'm telling the truth. If they lined up ten, I couldn't pick out the man I said I was going to kill until they told me who he was today. I know Bill Howry, I know Mr. Hicks, know them but that officer, I couldn't pick him out and if I did say it, it was no meaning there. I was drunk, that's all.

"Q. You didn't make this statement with any—

"A. No intent, no, I did not. I'll say anything when I get drunk. Shouldn't have drank, that's all, but I did. I drank too much.

\* \* \* \* \* \*

"Q. Now, Mr. Dailey, can you remember anything that occurred on the road from Round Rock to Georgetown?

"A. Well, I have faint memory somewhere out about the light or somewhere there that they stopped and anyhow, I got a glimpse of one of the officers, which one it was, I don't know. I was hit in the eye with a, hit with a fist. I don't know what I done. I may have cursed him. Maybe I deserved it. But I did get a lick and I guess it was my fault because I should have been quiet.

\* \* \* \* \* \*

"Q. You are saying if you got that lick, you probably deserved it?

"A. I imagine I cursed. I guess they got mad, got tired of hearing it or something. I was mad, too. I wasn't hurting anybody. I was in my own home. There was nobody damaged by me. I damaged my truck. I don't think it was right, but anyhow, it wasn't right for me to get drunk either.

"Q. And in this serious threat—now this is what we are charged with here today.

"A. I'm not guilty of a serious threat. Nothing serious to it because I didn't even know the man. I might have said it. I don't know. I might have cursed him. But there was no meaning there.

"Q. You didn't make it with any intent to carry it out?

"A. Oh, no."

The court charged the jury in part:

"II.

"To constitute this offense it is necessary that the threat, if any, be seriously made, and it is for the jury to determine whether the threat, if made, was seriously made, or was merely idle and with no intention of executing the same. Also you are instructed that a threat that a person will do an act merely to protect himself, or to prevent the commission of some unlawful act by another, does not constitute an offense."

"IV.

"You are instructed that if you believe from the evidence beyond a reasonable doubt that the defendant made a threat to take the life of N. W. Autrey as charged in the information, but that such threat, if any, was not seriously made or was merely idle and with no intention of executing the same, or if you have a reasonable doubt thereof, then you will acquit the defendant and say by your verdict 'Not Guilty'."

"IV (A)

"A. You are further charged that the threat, if any, must be seriously made and not merely the outburst of one's temper in the heat of passion, it must be the expression of a conclusion deliberately made. In this respect, you are further charged that if on the time and occasion alleged in the information you have a reasonable doubt concerning the threat, if any made, was made as an outburst of the defendant's temper in a heat of passion, you will give the defendant the benefit of this reasonable doubt and say by your verdict 'Not Guilty'."

■ The jury rejected appellant's defensive theory that the threats, if made, were not seriously made and had no meaning. The jury resolved the issue against appellant and the evidence, viewed in the light most favorable to the verdict, is deemed sufficient to sustain the conviction.

We find no merit in appellant's contention that the court erred in failing to give a charge on the law of self-defense.

■ Included in appellant's written objections to the court's charge are some 14 requested charges which it was suggested should have been given. The complaint in appellant's brief "that the court erred in not giving one or all" of those Special Requested charges does not comply with the requirements of Art. 40.09 V.A.C.C.P., Sec. 9, that the brief "shall set forth separately each ground of error of which defendant desires to complain on appeal * * *."

We have examined the charges suggested and the charge given and find the latter sufficient to protect the rights of appellant.

The judgment is affirmed.

OPINION

ON APPELLANT'S MOTION
FOR REHEARING

DICE, Judge.

Appellant insists that our opinion affirming his conviction ignores his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and Art. 1, Sec. 9, of our State Constitution, Vernon's Ann.St. to be secure from unreasonable searches and seizures, and to due process of law.

■ As we understand appellant's contention, it is that the officers unlawfully entered his home without a warrant in violation of his right of privacy and that under such facts he cannot be convicted for subsequently committing the offense of seriously threatening to take human life.

Certain federal and state authorities are cited by appellant, including Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; United States v. Stone, D.C., 232 F.Supp. 396; Brock v. United States, 223 F.2d 681 (5th Cir., 1955), and State of Texas v. Gonzales, 388 F.2d 145 (5th Cir., 1968), which involved the search of one's premises or his person in violation of the Fourth Amendment prohibiting unreasonable search and seizure and also the due process clause of the Fourteenth Amendment.

The authorities cited are not here applicable, as there was no search of appellant's home or person to obtain evidence.

■ The court's instruction to the jury "that a threat that a person will do an act merely to protect himself, or to prevent the commission of some unlawful act by another, does not constitute an offense,"—while not required under the evidence—amply protected appellant's rights, if any, under Art. 1267, P.C.

The motion for rehearing is overruled.