**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Jeffrey Leonard HOLMES et al., Defendants-Appellees.**

**No. 74–2419.**

United States Court of Appeals, Fifth Circuit.

Oct. 8, 1975.

Rehearing En Banc Granted Jan. 5, 1976.
See 525 F.2d 1364.

* Rule 18, 5 Cir.; See *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir. 1970, 431 F.2d 409, Part I.

William Stafford, U. S. Atty., Stewart J. Carrouth, Asst. U. S. Atty., Tallahassee, Fla., Mervyn Hamburg, App. Sec., Crim. Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Joseph S. Oteri, Martin G. Weinberg, Boston, Mass., for Ashley, Willy and Green.

Selig I. Goldin, Gainesville, Fla., for Holmes, Okus, Moody, Moody, DeWitt and Williams.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The United States appeals from a district court order granting motions to suppress evidence. The appellees, Jeffrey Holmes, Gail Moody, Norman Moody, Jr., Anthony Okus, Terrence DeWitt, Gregory Williams, Charles Ashley, Jr., Thomas Willy and Johnny Green, filed motions to suppress evidence seized on property owned by the Moodys and evidence seized from a motor van occupied by DeWitt and Williams and owned by Holmes. They contended that government agents conducted an illegal search which led to the discovery of this evidence by attaching an electronic beacon to Holmes' van. They challenged on independent grounds the searches of the Moody property and of Holmes' van. The district judge held that the installation and use of the beacon was an illegal search and granted all motions to suppress, holding also that agents conducted an illegal search of the Moody property.

On appeal the government contends that no illegal searches and seizures were conducted and challenges the standing of certain appellees to contest the legality of the various searches which occurred.

We affirm as to appellees Holmes, DeWitt, Williams, Gail Moody, Norman Moody and Okus. We affirm in part and reverse in part as to appellee Ashley. We reverse as to appellees Willy and Green.

## THE UNDERLYING FACTS

In late July and early August of 1973, appellee Holmes negotiated the sale of 300 pounds of marijuana to a state undercover agent, Steve Cox.[1] In the early evening of August 3, Cox met with Holmes at a lounge in Gainesville, Florida, in the Northern District of Florida, in order to display the $45,500 cash needed to complete the transaction. While the two were inside the lounge another agent by use of a magnet attached an electronic surveillance device under the right rear wheel of Holmes' van, parked on a lot outside the lounge.

The battery-operated device, called a beacon or "beeper", emits periodic signals which can be picked up on radio frequency. These signals establish the approximate location of the object to which the beacon is attached by providing a line of position, to the left or to the right, between the transmitter and the intercepting equipment.

The agents admittedly used the beacon in order to locate the source of the marijuana in the event visual surveillance of the van was lost. They did not attempt to obtain a warrant.

The agents then began what was to have been constant visual surveillance of Holmes and his van. During the early morning hours of Sunday, August 5, 1973, however, the van was moved without their being aware. When he learned of the van's disappearance, the officer in charge of the joint state/federal surveillance operation, agent Ginley, ordered a plane into the air to track it.

The pilot of the plane was never able to spot the van visually, but by 9:15

1. The marijuana was to be sold from a large shipment reportedly headed north. Cox initially was to purchase 500 pounds, but the amount was reduced to 300 pounds.

A.M., he was able to determine from the electronic beacon's transmission that it had stopped at Federal Point, a sparsely settled rural area 60 miles to the east of Gainesville on the St. Johns River in Putnam County. Putnam County is in the Middle District of Florida. The pilot did not pinpoint the exact location of the van, in part because he feared that flying low would alert the driver to the aerial surveillance and in part because the area was heavily wooded, but he was able to place it within a rectangular area of about one hundred by two hundred yards adjacent to the river.

The rectangle was bounded to the north by a large barn, to the south by a church, and to the west by the river. The Moody home was near the center of the rectangle, facing east. North of the barn lay a large, open field. The area to the south was heavily wooded. Immediately behind the home was a small yard. A Franklin motor home was parked ten yards to the rear of the house, in thick trees. A shed was located ten yards to the rear of the motor home, twenty yards from the house. From behind the shed, extending to the river's edge, the area was heavily wooded, with dense undergrowth.

The agents, with the aid of the pilot's directions by radio, arrived at Federal Point between 11:00 and 11:30 A.M. and surrounded the location. At 11:30, unable to sight the van, they asked the pilot to verify the van's position and were told that it had departed and was moving west toward Gainesville.

After learning of the van's departure, agent Ginley sent two agents, Sedalas and Vipperman, between 12:00 and 12:30 P.M., to the back of the Moody property. Sneaking through the thick growth they spotted the shed and motor home. Agent Vipperman, under dense cover, came close to the shed and, admittedly looking for evidence of marijuana, peered into a large hole in its rear. From this vantage point, he smelled

marijuana and was able to see burlap bags of a type commonly used to pack it. Two individuals were in the shed, but he could see only the lower part of their bodies. He reported these findings to agent Ginley.

In the meantime, around 11:30 A.M., Holmes had called Cox and told him the van had been picked up and would return with the marijuana at about noon. Lt. McGraw, of the Gainesville Police Department, then left for Federal Point with the State Attorney and an investigator for the State Attorney's office. Twenty-five miles east of Gainesville, they passed a van which they believed to be Holmes'. They turned to follow it and verified it as his by a license check. After it went over railroad tracks without bouncing, indicating its heavy load, and observing that it was curtained, they stopped the van and searched it. They seized 1200 pounds of marijuana and arrested its two occupants, appellees DeWitt and Williams.[2] Agent Ginley was notified of the arrests and seizures. This was at a time after he had sent Sedalas and Vipperman into the woods behind the Moody property.

At 1:00 P.M., now knowing that marijuana was in the shed and that a large quantity had been seized from the van, Ginley sent agent Henderson to the Putnam County seat, Palatka, to obtain a search warrant. About 2:45 P.M., before the warrant arrived, agent Adams from the airplane radioed agent Ginley of movement on a dock by the river. Although no agent had seen any activity on the Moody premises, agent Ginley ordered the premises secured.[3] Appellees Gail and Norman Moody, and appellee Okus, on the porch of the house, were arrested. The shed, the house and the motor home were entered, not for purposes of a search, but solely to determine if anyone else was present. At 4:15 P.M. agent Henderson returned with a warrant issued by the County Judge of Put-

---

2. Holmes was not arrested until later, about 1:30 P.M.

3. The activity was later discovered to have been two fishermen on a dock located to the south on the premises of the adjacent church.

nam County authorizing a search of the house, barn, shed, and motor home. The agents seized 1200 pounds of marijuana in the shed and small amounts of marijuana and related paraphernalia in the house. Sweepings of the substance were found in the carpet of the motor home. In the glove compartment of the motor home the agents found a lease contract naming appellee Ashley as its lessee. Later followup of this lead led to the arrests of appellees Ashley, Willy and Green.[4]

## THE INDICTMENT AND THE MOTIONS TO SUPPRESS

A Northern District of Florida grand jury returned a four-count indictment. Count One charged Gail and Norman Moody, Okus, Holmes, DeWitt, Williams, Ashley, Willy, Green and two others with conspiracy to possess with intent to distribute marijuana, in violation of Title 21, U.S.C., Section 846. Count Two charged the two Moodys, Okus, Holmes, DeWitt and Williams with possession with intent to distribute marijuana, occurring on August 5, 1973, in violation of Title 21, U.S.C., Section 841(a)(1) and Title 18, U.S.C., Section 2. Counts Three and Four, not involved on this appeal, charged Holmes with using a telephone on August 4, 1973 and August 5, 1973, to facilitate the commission of the conspiracy and substantive offenses, in violation of Title 21, U.S.C., Section 843(b).[5]

All nine appellees filed motions, pursuant to F.R.Crim.P. 41(e), to suppress, alleging that the attachment of the beacon to the van was an illegal search and that all evidence seized from the Moody property and the van was subject to suppression as "fruit of the poisonous tree".

See *Wong Sun v. United States,* 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. They also contended that agent Vipperman conducted an illegal search of the shed, requiring suppression of all evidence seized on the Moody property. Finally, they argued that the warrant was invalid because the source of the information contained in the affidavit was not set forth.[6]

## THE RULINGS APPEALED FROM

The district judge, after a lengthy evidentiary hearing, held that the use of the beeper to monitor the movements of the van was a search subject to the Fourth Amendment, and that the search was illegal because of the failure to obtain a warrant for its installation. He found further that an application for a warrant would have been rejected because no probable cause existed to justify its installation.[7] He ruled that no evidence at the Moody property would have been discovered, nor would the van with its contraband have been intercepted, without the aid of the beacon. He therefore ordered the suppression of all the evidence as "fruit" of the initial search. See *Wong Sun,* supra. The order of suppression ran in favor of all nine appellees because the district judge mistakenly believed that the government conceded the standing of each of them to challenge the installation and use of the beeper.

The trial judge made an alternative finding, ruling that agent Vipperman's peering into the shed, preceded by a trespass onto the Moody property in order to secure a vantage point, was an illegal search conducted without probable cause and lacking the authorization of a warrant. He ordered all evidence

---

4. These three were connected to the contraband solely through evidence uncovered as a result of the seizure of this rental contract.

5. Holmes pled guilty to Count Four.

6. DeWitt and Williams also contended that the police lacked probable cause to stop and search the van on its return to Gainesville. In view of our disposition of the other points raised, see text, we do not address this issue.

7. At no time prior to its installation did Holmes indicate his van was to be used to transport the marijuana. The agents had no information of prior use of the van in illicit transactions. The agents testified that they "assumed" the van would be used because of the quantity of marijuana involved. Holmes did not confirm their suspicions until he called agent Cox on the morning of August 5, over forty hours after installation of the beacon.

seized from the Moody property suppressed.

Because of his rulings on the use of the beeper and the search of the shed, the district judge did not consider the challenge to the validity of the search warrant.

The government appeals, contending that its use of the beeper is not a search subject to the Fourth Amendment, but that if it is, that Gail and Norman Moody, Okus, Ashley, Willy and Green have no standing to challenge its use. The government also appeals the ruling that the peering into the shed violated any of the appellees' Fourth Amendment rights.

We affirm the order of the district court as to appellees Holmes, Gail and Norman Moody, Okus, DeWitt and Williams. We affirm in part and reverse in part as to appellee Ashley. We reverse as to appellees Willy and Green.

## INSTALLATION AND USE OF THE ELECTRONIC BEACON

██ We hold that the installation of an electronic tracking device on a motor vehicle is a search within the meaning of the Fourth Amendment.[8] Although the government does not dispute that its agents were seeking to unearth evidence of crime and the identity of associates in crime for criminal prosecution,[9] it argues that the installation was not a search because no privacy was invaded. It relies upon the Supreme Court decision in *Katz v. United States,* 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. Its premise is twofold: (1) that although a technical trespass was committed, a citizen can have no reasonable expectation of privacy in a vehicle left on a public parking lot with its exterior and much of its interior accessible to any passerby;[10] and (2) that a citizen cannot reasonably expect his movements on public roads to remain private.

Each premise in the government's analysis is defective. We likewise turn initially to *Katz,* supra, for its explication of Fourth Amendment application. Justice Stewart there noted that the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all." (Footnote omitted). 389 U.S. at 350, 88 S.Ct. at 510, 19 L.Ed.2d at 581. The location of the vehicle at the time of the installation is not controlling:

> What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See *Lewis v. United States,* 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312; *United States v. Lee,* 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582.

When a person parks his car on a public way, he does not thereby give up all expectations of privacy in his vehicle. There is a right to be secure, even in public. Certainly, the driver may not complain if police observe objects in plain view of the car. See, e. g., *Marshall v. United States,* 5 Cir. 1970, 422

---

**8.** We have located only one decision addressing this issue. In *United States v. Martyniuk,* D.Oregon 1975, 395 F.Supp. 42, the court reached a conclusion identical to ours.

**9.** The agents were admittedly trying to locate the source of the marijuana.

**10.** The government relies upon *United States v. Johnson,* 5 Cir. 1970, 431 F.2d 441 (en banc) and *United States v. Polk,* 5 Cir. 1970, 433 F.2d 644, in which this court held that opening an unlocked car door in order to determine the vehicle inspection number (VIN) was not a search because there can be no reasonable expectation of privacy in such numbers, and upon *United States v. Powers,* 4 Cir. 1971, 439 F.2d 373, cert. denied 402 U.S. 1011, 91 S.Ct. 2198, 29 L.Ed.2d 434, where the Fourth Circuit held that such conduct was a search but upheld the police action because of the minimal invasion of privacy involved, the quasi-public nature of the VIN, and the frequent need to check the VIN expeditiously before the vehicle is moved.

F.2d 185. Nor may he complain if they search out his VIN, see n. 9, *supra,* take a paint scraping, or compare tire treads for identification comparisons. These intrusions are of limited scope, purpose and duration. It is equally certain, however, that he may complain if the police break into his car and seize objects hidden in the trunk or glove compartment, even if the car is parked in a public lot, without probable cause and the existence of exigent circumstances. Yet the government's first premise would encompass just such condemned police action.[11]

Further, there is no way to protect against this type of intrusion once one leaves home and enters the public streets. There is no way to lock a door or place the car under a protective cloak as a signal to the police that one considers the car private.

Conceding the right of the agents to be in the parking lot next to the van, they had no right to attach the beacon without consent or judicial authorization. We are unwilling to hold that Holmes, and every other citizen, runs the risk that the government will plant a bug in his car in order to track his movements, merely because he drives his car in areas accessible to the public. The presence or absence of a physical intrusion into the interior of the car does not affect this conclusion. See *Katz,* supra.

In contending that a citizen cannot expect his movements on public roads to remain private, the government assumes that the nature of the information it seeks to uncover controls whether or not a search has occurred. Thus, it tries to distinguish the beeper in the instant case from the phone tap at issue in *Katz* because the latter picks up conversation, an area in which, according to the government, a citizen has an extraordinary expectation of privacy.[12]

The protections of the Fourth Amendment, however, do not depend entirely upon the nature of what is seized. At one time, there were substantial limitations upon what objects were subject to seizure. For example, instrumentalities of crime could not be seized until 1921, *Gouled v. United States,* 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, and "mere evidence" until 1967. *Warden v. Hayden,* 1967, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782. In *United States v. Hunt,* 5 Cir. 1974, 505 F.2d 931, 936, an opinion which traces this development, Judge Goldberg noted that increasing concern with the methods used by the government to obtain the evidence it sought accompanied the breakdown of these barriers as to what was subject to search and seizure and led to Justice Stewart's comment in *Katz,* supra, 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582, that "the Fourth Amendment protects people, not places".

The real question, then, in cases of this type and the proper focal point for inquiry is whether the government, in searching out information not otherwise available, invades an individual's "right of personal security, personal liberty, and private property", *Boyd v. United States,* 1886, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751, and violates "the privacy upon which he justifiably relied". *Katz,* supra, 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583. By this approach, courts are able to distinguish visual surveillance from electronic surveillance, eavesdropping from wiretapping, a plain view from a breaking and entering.

No rational basis occurs to us for distinguishing the violation of the expectation of privacy involved in the installation of a "beeper" on a car, in order to trace its movement, from the placing of a tap on the outside of a telephone booth in order to overhear and record conversations, *Katz,* supra. In addition, of course, the "beeper" installation was accomplished by an actual trespass. A

11. There appears to be slight if any difference between installing a beacon on the underside of a car and hiding an agent in the trunk who signals the location of the car by radio.

12. The beacon does convey information as useful as any obtained from a wiretap. As Judge Tuttle of this panel observed at oral argument, the beeper continually broadcasts the statement, "Here I am".

search "ordinarily implies an examination of an individual or of his property to discover contraband or evidence of some violation of the law, to be used in prosecution of a criminal action". *United States v. Johnson,* 5 Cir. 1970, 431 F.2d 441, 445 (Godbold, J., dissenting) (en banc). It is "a probing, exploratory quest for evidence of crime". *Marshall v. United States,* supra, 422 F.2d at 189. This was the admitted reason for placing the beeper on the van. That no evidence is discovered initially, either with a wiretap or a beacon, does not preclude the later discovery of fruits. That is the normal expectation at the time of the initial intrusion.

A person has a right to expect that when he drives his car into the street, the police will not attach an electronic surveillance device to his car in order to track him. Although he can anticipate visual surveillance, he can reasonably expect to be "alone" in his car when he enters it and drives away.[13]

Without intending to imply that the use of the beacon without judicial supervision is anything less than obnoxious and repulsive, we think the Supreme Court's early admonition bears repeating:

It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.

*Boyd,* supra, 116 U.S. at 635, 6 S.Ct. at 535, 29 L.Ed. at 752. If this conduct is held to be outside the reach of the

Fourth Amendment, there is nothing to forestall the implanting of a similar device on one's person, and this on no greater grounds than existed in the present case: the merest of suspicions. No safeguards would be imposed except by the self-restraint of law enforcement officials.

It must be remembered that

[t]he Bill of Rights, of which the Fourth and Fifth Amendments are a part, was incorporated in the Constitution in an effort to give the courts of this country the authority, in James Madison's immortal phrase, "to oblige the government to control itself".

(Footnote omitted). *Brock v. United States,* 5 Cir. 1955, 223 F.2d 681, 684. The genius of the founding fathers lies in their development of an instrument capable of matching ingenious attempts of the government to outflank its protections.

The government further contends that, even if the installation is subject to the Fourth Amendment, probable cause existed to justify its use.[14] The district judge determined otherwise because the agents, at the time of the installation had no information that the van had ever been used to transport contraband and no information that it would be so used in the instant transaction. See n. 7, *supra.* He considered their actions as based only upon an unfounded suspicion, not confirmed until Holmes called agent Cox one and a half days later, on August 5, to say that the van would be used because of the large quantity of marijuana to be delivered.

The resolution of this controversy need not detain us, because the agents "ig-

13. The government contends that there is no right of privacy violated because there is no right to expect that movements on the public roads will be private, and that the device only augments that which can admittedly be done by visual surveillance. If this be true, and the facts contradict the position, then there is no need for the device in the first place. Its value lies in its ability to convey information not otherwise available to the government.

14. The government also urges that probable cause should not be the controlling standard

because the invasion of privacy involved is minimal, relying upon *United States v. Powers,* 4 Cir. 1971, 439 F.2d 373. See n. 9, *supra.* We cannot agree. The activity in *Powers,* involving the opening of a door to inspect the VIN—activity which this circuit has refused to condemn as a search subject to the Fourth Amendment, see n. 9 *supra*—is limited in time, scope, and duration, unlike that involved when a beacon is used. In the instant case, the beacon was in operation for over 42 hours.

nored 'the procedure of antecedent justification * * * that is central to the Fourth Amendment,' " (footnote omitted), *Katz*, supra, 389 U.S. at 359, 88 S.Ct. at 515, 19 L.Ed.2d at 586. Their failure to obtain a warrant is fatal. The search, therefore, is *per se* unreasonable, see *Katz*, supra, 389 U.S. at 357, 88 S.Ct. at 514–15, 19 L.Ed.2d at 585.[15]

Evidence seized during an unlawful search is subject to exclusion. *Weeks v. United States*, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652. That the evidence in this case was not unearthed at the time of the initial invasion is of no moment: "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319". *Wong Sun v. United States*, supra, 371 U.S. at 484–85, 83 S.Ct. at 416, 9 L.Ed.2d at 453. The question to be addressed in determining what evidence is subject to suppression is

" 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

*Wong Sun*, supra, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d 455.

■ The district judge found, with substantial evidentiary support, that the evidence was seized from the Moody property and the van as a direct product of the unlawful installation of the beeper. Without its aid, the agents would never have been directed to the Federal Point area, would not have discovered the Moody property, and would not have been in a position to intercept the van on its return. We agree with him that all the evidence seized was obtained by exploitation of the primary illegality, and was due to be suppressed.

## THE ISSUE OF STANDING

The district judge did not address the issue of the standing of each appellee to challenge the unlawful search, believing that the government conceded it as to all. Our close review of the transcript reveals no such waiver.

■ Evidence obtained in violation of the Fourth Amendment cannot be used in a criminal prosecution against an individual whose constitutional rights were thus violated. *Jones v. United States*, 1960, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697, 702; *Alderman v. United States*, 1969, 394 U.S. 165, 173–74, 89 S.Ct. 961, 965–67, 22 L.Ed.2d 176, 186–87. But the Supreme Court has consistently refused to extend the protections of the exclusionary rule to those whose Fourth Amendment rights were not infringed. *Alderman*, supra, 394 U.S. at 171–72, 89 S.Ct. at 965, 22 L.Ed.2d at 185–86.

To challenge the admissibility of evidence because of a Fourth Amendment violation, an individual must be a "person aggrieved". F.R.Crim.P. 41(e). A "person aggrieved" is one who is "a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else". *Jones*, supra, 362 U.S. at 261, 80 S.Ct. at 731, 4 L.Ed.2d at 702. On appeal, the government concedes the standing of Holmes, the owner of the van, and DeWitt and Williams, its occupants, to challenge the use and installation of the beacon. See *Jones*, supra, 362 U.S. at 265–67, 80 S.Ct. at 733–34, 4 L.Ed.2d at 704–06. As to these three, therefore, we affirm the order of the court below.

But the government challenges the standing of the remaining appellees to contest the installation of the beacon. We address initially the standing of Norman and Gail Moody and Okus, and deal separately with the contentions of Ashley, Willy and Green.

15. The government does not argue that the search falls within any of the exceptions to the warrant requirement.

We find that Gail and Norman Moody and Okus have standing to challenge the installation and use of the beeper. They do not acquire standing because of their status as co-defendants or co-conspirators. See *Alderman,* supra. Rather, we find that the transmittals from the beacon constituted a "continuous search"; and standing is conferred because of the movement of the van to the area of the Moody property when all three were present.

The operation of the beacon is analogous to phone calls made on a tapped line. The government intrusion does not cease with the installation of the electronic device. The position of the Moodys and Okus is comparable to that of a caller whose conversation is overheard because of the monitoring of the calls of another. See *Alderman,* supra, 394 U.S. at 176, 89 S.Ct. at 968, 22 L.Ed.2d at 188. As to these three, therefore, we affirm the order of suppression as to all evidence seized on the Moody premises as the product of the illegal use of the beacon.

To recognize that these three have standing to challenge the use of the beeper while the van was on the Moody property, however, does not require suppression of all evidence gathered from the use of the beeper as "fruits". The independent violation of their Fourth Amendment rights ceased when the van left the Moody property.[16] Only evidence which was discovered by exploitation of the wrong done to them by use of the beeper while the van was on the Moody property is subject to suppression upon their motion. This, of course, includes all evidence seized at the Moodys. It does not, under the circumstances, include the marijuana seized from the van, because this seizure would have occurred regardless of whether the van ever entered the Moody property.

The Moodys and Okus may still challenge the search of the van, including the legality of the installation and use of the beacon, however, because they were charged, in Count Two of the indictment, with a possessory offense.[17] This circuit has indicated its intent to follow the "automatic standing" rule established in *Jones,* see *United States v. Hunt,* 5 Cir. 1974, 505 F.2d 931, 939, n. 9, and we adhere to that position.[18] Because the installation and use of the beacon was an unconstitutional search and seizure, the marijuana seized from the van must also be suppressed as to the Moodys and Okus.

---

16. Their situation is analogous to that of a caller who hangs up but is implicated in another phone call to which he was not a party. *Alderman,* supra. Cf. *United States v. Scasino, et al.,* 5 Cir. 1975, 513 F.2d 47.

17. The possession count is founded only upon the marijuana seized in the van, and not on that seized at Federal Point, because the Moody property, located in Putnam County, lies outside the jurisdiction of the grand jury sitting in the Northern District of Florida. Gainesville, where the van was stopped, is in Alachua County and within the Northern District.

18. The government, in its brief and at oral argument, asserted that the Moodys and Okus were not charged with possession of the marijuana at the time of its seizure from the van; and that the automatic standing rule is therefore inapplicable. The indictment, however, charged the Moodys, Okus, Holmes, DeWitt and Williams with possession on August 5, the date of the seizure, and all parties were joined in the same count. Government reliance upon *United States v. Palazzo,* 5 Cir. 1974, 488 F.2d 942, and *United States v. Scheffer,* 5 Cir. 1972, 463 F.2d 567, cert. denied sub nom. *Stecher v. United States,* 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248, is misplaced. In *Palazzo,* a seller sought automatic standing, but the evidence was seized from the buyer. The indictment carefully charged the seller with possession at a point in time prior to the sale. The seller had, by the time of sale, lost his property interest and physical possession. The government's case in *Scheffer* was not based upon possession at the time of the search, and the indictment did not allege that the appellants themselves ever possessed the seized cocaine. These cases fall within the holding of *Brown v. United States,* 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208. The government does not contend there was any sale. In these circumstances, the Moodys and Okus were charged with constructive possession of the marijuana seized from the van and come within the automatic standing rule.

## THE SEARCH OF THE SHED

■ The district judge ordered suppression of the evidence seized from the Moody property on an alternative ground. He found, with ample evidentiary support, that the shed was within the curtilage and that agent Vipperman, in peering into its rear, trespassed on the curtilage. He ruled that this warrantless peering into the shed after trespassing was an unlawful search and seizure which did not fall within the "open fields" exception to the warrant requirement. See *Hester v. United States,* 1925, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898. In other words, he determined that the marijuana lying in the shed was not in "plain view", and ordered all evidence seized from the Moody property suppressed as "fruit".

Prior to entry upon the Moody land, the agents knew the general location of the van. It could have stopped on the Moody property, but it could as easily have stopped in the woods or near the church. For that matter, it could have stopped at any point enroute from Gainesville to Federal Point to pick up the marijuana. No agent ever saw the van on the premises or saw signs of *any* activity, legal or illegal. At the time of entry, the agents also knew the van had been seized, so they could not have been looking for the van. Rather, they were looking solely for evidence of crime on little more than conjecture that the van had in fact stopped there to make its pickup. Agent Vipperman admitted that his sole purpose in getting close enough to peer into the hole in the shed was to look for marijuana.

In *United States v. Davis,* 5 Cir. 1970, 423 F.2d 974, Judge Gewin set out the ground rule for determining the applicability of the "plain view" rule: the question to be addressed is "whether the observing officer had 'a right to be in the position to have that view.'" *Id.* at 977. When a law enforcement agent trespasses solely to unearth evidence of crime, he has no "right to be in the position to have that view". As Judge Gewin stated, "[W]here police officers trespass *in*

*order to secure the view,* we have not hesitated to find a search." (Emphasis added). *Id.*

In *Brock v. United States,* 5 Cir. 1955, 223 F.2d 681, this court dealt with an intrusion similar to that involved in the instant case. Federal agents observed the operation of an illicit still for two days and raided it without first obtaining a warrant. They then proceeded to a house one-quarter of a mile away because they thought that the people arrested in the raid had come from there. Knowing they could not obtain a warrant on the basis of information then available to them, they decided to obtain the evidence they needed to support a search by going onto the premises and peering into a bedroom window. We held that standing on a man's premises and looking into a bedroom window hoping to obtain evidence to support a search of the house was an illegal search and ordered suppression.

The agents in the instant case, as noted, had no basis for believing the van had ever entered the Moody property. We are not dealing with an accidental sighting from outside the curtilage or from within while on another, lawful purpose. See *Hester,* supra, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898. They entered solely to secure evidence of crime which would support a warrant for a later and thorough search of the area, and they did so with no basis except speculation for believing any illegal activity was there occurring. This action, condemned in *Brock,* fares no better here.

The government, while recognizing that an examination of property rights is relevant to the determination of privacy interests, argues that property rights in the absence of a reasonable expectation of privacy in the property involved will not support a Fourth Amendment claim. See *Hunt,* supra, 505 F.2d at 937. Looking to the facts, the government argues that the Moodys and Okus had no reasonable expectation that the contents of the shed would remain private because no fences enclosed any part of the property, no No Trespassing signs were post-

ed, and there was no proof of special attempts to conceal the marijuana from any "passerby".

The government would have us ignore the character of the Moody property. Whatever precautions a homeowner in an urban area might have to take to protect his activity from the senses of a casual passerby, a dweller in a rural area whose property is surrounded by extremely dense growth need not anticipate that government agents will be crawling through the underbrush by putting up signs warning the government to keep away.[19]

More to the point

[T]he continuing concern with property rights is prompted by the realization that an individual often has a very reasonable expectation of privacy in his private property, and it is this expectation which the Fourth Amendment protects.

*Hunt,* supra, 505 F.2d at 937.

Implicit in this court's decisions in *Davis* and *Brock* is the finding that a homeowner has a reasonable expectation of privacy in his house and all within its curtilage. And explicitly, this court noted, in *Davis,* 423 F.2d at 977, that "The high degree of judicial sanctity which the courts have accorded to dwellings is based upon the concept of privacy and the right to be left alone". See *Brock,* 223 F.2d at 685, where the court stated that the police action there violated the homeowner's "right to be let alone".

The evidence derived from this intrusion, the only evidence which could support the later search of the house and the Franklin motor home, must be suppressed. The lower court's order of suppression of the evidence seized on the Moody property insofar as it ran in favor of Gain and Norman Moody and Okus, is affirmed on this ground also.

19. This contention is rather like arguing that the defendant *Brock* had no reasonable expectation of privacy because he failed to pull his

## STANDING OF ASHLEY, WILLY AND GREEN

The government contends that appellees Ashley, Willy and Green have no standing to contest the installation and use of the beeper, or the search of the shed, the Moody home and the van. It concedes Ashley's standing, as lessee, to challenge the search of the motor home, but not that of Willy and Green.

◼ We agree that Ashley, Willy and Green have no standing to contest the installation and use of the beeper. They do not assert any property interest in the van; and they were not occupants, as were DeWitt and Williams. Nor were they present on the Moody property when the van was there. Under these circumstances, no Fourth Amendment rights of theirs were violated by its installation or use. See *Alderman,* supra; *Jones,* supra.

Ashley, Willy and Green lack standing to challenge the stop and search of the van in Gainesville, for they were not occupants, do not assert any property interest in the vehicle, and were not charged with a possessory offense. See *Brown v. United States,* 1973, 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208, 214; *Jones,* supra; *United States v. Foster,* 5 Cir. 1975, 506 F.2d 444, cert. denied 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104; *United States v. McConnell,* 5 Cir. 1974, 500 F.2d 347, cert. denied 1975, 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424.

◼ They also lack standing to challenge the legality of Vipperman's search of the shed and the search of the Moody home pursuant to the search warrant. They assert no proprietary interest in the Moody property and were not present at the time of the search. They failed to show that they had any reasonable expectation of privacy in the premises. See *Brown,* supra; *Jones,* supra; *United States v. Foster,* supra; *United States v. McConnell,* supra.

blinds, when his window could not be seen from the road.

Ashley's, Willy's and Green's connection to the activities at Federal Point was uncovered when the government agents, pursuant to a search warrant authorized by a Putnam County judge, searched the Franklin motor home and discovered a rental contract signed by Ashley. Subsequent investigation of this lead led to their arrests. The record does not disclose the nature of Willy's and Green's relationship to the motor home. Willy and Green have not alleged any property interest in it, and were not present when the warrant was executed. In these circumstances, they lack standing to challenge this search also. See *Alderman,* supra; *Jones,* supra; *United States v. Foster,* supra; *United States v. McConnell,* supra.

Because Willy and Green lack standing to challenge any of the searches conducted, the lower court's order of suppression must be reversed as to them.

## VALIDITY OF THE SEARCH WARRANT

The only search which appellee Ashley has standing to challenge is the search of the motor home pursuant to the warrant.[20] He contends that the warrant failed to disclose the source of the affiant's knowledge. The district judge did not rule on this issue. At the suppression hearing, however, he expressed concern as to the sufficiency of the affidavit.

The existence of probable cause is to be determined by a "neutral and detached magistrate", not by the officer "engaged in the often competitive enterprise of ferreting out crime". *Johnson v. United States,* 1948, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440. The affidavit, therefore, must provide a basis for this exercise of judgment.

In *Giordenello v. United States,* 1958, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed. 1503, 1509–10, the Supreme Court struck down an arrest warrant because

> The complaint contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein; it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made.

Disclosure of the source of the information must be accompanied by a statement of "*particular* facts or circumstances which justify concluding that the informant is a reliable or trustworthy person". *United States v. Chavez,* 5 Cir. 1973, 482 F.2d 1268, 1270.[21]

Scrutiny of the affidavit[22] confirms the district judge's doubts and sus-

20. While the agents entered the motor home prior to the arrival of the warrant, the evidence complained of below—the rental contract and marijuana sweepings—was not found at the time of this initial entry.

21. These principles are fully applicable when the validity of a search warrant is at issue. *Aguilar v. Texas,* 1964, 378 U.S. 108, 112, n. 3, 84 S.Ct. 1509, 1513, 12 L.Ed. 723, 727.

22. BEFORE ME, WM. E. WARREN, Judge of the County Court for Putnam County, Florida, personally came WAYNE HENDERSON, agent of the Drug Enforcement Agency of the U. S. Department of Justice, who being first duly sworn, deposes and says:

That affiant has reason to believe and does believe that in, upon and about the premises located in Putnam County, Florida, and described as follows, to-wit:

[Here follows a description of the premises and its location]

and there is now and has been kept and used in said premises certain illegal drugs and substances, among which is marijuana, or cannabis sativa, in violation of Section 893 Florida Statutes.

Affiant further says that the facts establishing the grounds for this application are as follows:

That on August 3, 1973, one Jeff Holmes offered to sell 300 pounds of marijuana or cannabis sativa to an undercover agent. An electronic beacon device was attached to the van in the possession of the said Jeff Holmes, being a Chevrolet make.

On August 5, 1973, said beacon attached to said van was determined to be in the vicinity of Federal Point in Putnam County, Florida, by ground and aircraft surveillance. On said day said vehicle was stopped in Gainesville, Florida, while enroute from Federal Point and contained approximately 1700 pounds of marijuana or cannabis sativa.

tains Ashley's challenge. The affidavit fails to set forth the source of the affiant's information. The Putnam County judge issuing the warrant could not determine whether the information was gained firsthand or from others, and if from others, he had no reason to credit their reliability.[23] In this instance, he abdicated his responsibility to make "the inferences from the facts which lead to the complaint" to the officers " 'engaged in the often competitive enterprise of ferreting out crime,' *Giordenello v. United States,* supra, 357 U.S. at 486, 78 S.Ct. at 1250; *Johnson v. United States,* supra, 333 U.S. at 14, 68 S.Ct. at 369." *Aguilar,* supra, 378 U.S. at 115, 84 S.Ct. at 1514, 12 L.Ed. at 729. The fruits of the search of the motor home must be suppressed as to Ashley.

## CONCLUSION

In sum, we find that the government conducted three illegal searches: by installing and using the beacon; in peering into the shed; and in executing the defective warrant. Holmes, DeWitt and Williams have standing to challenge the beacon search as owner and occupants of the van. Gail and Norman Moody and Okus have standing to challenge the beacon search because of their presence when the van entered the Moody property and because they are charged with possession of marijuana when it was seized from the van. The district court order of suppression is affirmed as to these six.

Willy and Green have no standing to challenge either the search by beacon, the search of the shed, or the search conducted pursuant to the search warrant. We reverse the district court order suppressing evidence which the government seeks to introduce against them.

Ashley has standing to challenge only the validity of the warrant authorizing the search of the motor home he rented. Because the warrant is invalid, evidence seized from the motor home must be suppressed. The district court order of suppression of all evidence is reversed as to the evidence seized elsewhere on the Moody property and in the van and affirmed as to that seized in the motor home.

Affirmed in part; reversed in part.

---

Subsequent investigation and surveillance of the area in which the beacon was determined to be in the vicinity of Federal Point revealed that said van was located behind the white house above described; and where there was also parked a Franklin Mobile Home with an outbuilding nearby said white house. Officers in the vicinity of the above described location could smell strong odor of marijuana and overheard voices describing marijuana transactions. Noises associated with the packaging of marijuana were also overheard; also burlap bags such as used to package marijuana were also observed.

**23.** In fact, the affiant, Wayne Henderson, was the agent who placed the beacon on the van. The remainder of his information was secondhand. Although he was sent into the woods, he saw nothing.

The affidavit contained several factual inaccuracies. Vipperman, the only agent to get close to the shed, testified that he could not hear what the occupants of the shed were discussing, and heard no noises of packaging. The van was never observed behind the house or anywhere on the Moody property.