**Application of the UNITED STATES of America for an Order Authorizing Use of a Pen Register Device.**

**Misc. No. 75 PR 1.**

United States District Court, W. D. Missouri, W. D.

Jan. 19, 1976.

Bert C. Hurn, U. S. Atty., Kurt P. Schulke, Special Attorney for the Dept. of Justice, Kansas City, Mo.

## MEMORANDUM OPINION AND ORDERS

JOHN W. OLIVER, District Judge.

### I.

This case pends on the second application made by a Special Attorney of the Organized Crime and Racketeering Section, Kansas City Field Office, Department of Justice, for an order authorizing the use of a pen register device on five particular telephones used by three named individuals, and others yet unknown, located in Kansas City, Missouri. The second application, as did the first application, also prays for an order authorizing the Southwestern Bell Telephone Company to furnish the applicant all necessary assistance to install the pen register.[1] The pending application is based solely upon and purports to invoke

power allegedly granted this Court under the All Writs Act, 28 U.S.C. § 1651. As will be later developed in detail, the government has unsuccessfully attempted to invoke other sources of power and jurisdiction in support of its requested orders in an unsuccessful intervening application which it presented to the Chief Magistrate of this Court.

Included in the papers presently before the Court is the government's memorandum of December 1, 1975 and suggestions in support of application for the orders authorizing use of a pen register device. That memorandum and another paper entitled "Government's Filing Under Seal of a Certain Matter Concerning the Use of a Pen Register Device and Suggestions Attached Thereto" purports to state the procedural steps which the Special Attorney has taken in connection with the three applications filed for its requested orders. ·

Any implication which may appear in those papers, however, that this Court may have suggested that the government present a Rule 41, Federal Rules of Criminal Procedure, application to Chief Magistrate Calvin K. Hamilton for orders similar to those requested in the pending application is inaccurate. The files and records of this Court establish the following sequence of events. The government's first attempt to obtain its requested orders occurred when Mr. Schulke, the Special Attorney named in the application, presented the Court with an application, a supporting affidavit of a special agent of the Bureau of Alcohol, Tobacco and Firearms, United States Treasury Department, and two proposed orders which purported to authorize the use of a pen register device.

None of the papers filed in connection with the government's first application filed with this Court, however, made ref-

---

1. A. T. & T. has apparently recommended to all Bell Telephone subsidiaries that company participation in a pen register device installation is forbidden as a matter of company policy unless such installation will have been authorized pursuant to "the safeguards of the federal wiretap statutes, 18 U.S.C. § 2510 et seq." See *In re Joyce* (5 Cir. 1975) 506 F.2d 373, 375. We have not been advised by the government whether Southwestern Bell Telephone Company has adopted the A. T. & T. "recommendation."

erence to any statutory or rule authority to support the issuance of any order.

This Court at that time requested that the government prepare and file *in camera* a memorandum of law in support of its original application. Mr. Schulke submitted a short memorandum of law which candidly stated that "the United States recognizes that no specific statutory authority exists authorizing such devices." The government suggested in its original memorandum that the trilogy of *Osborn v. United States,* 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) made it clear that "the technical requirements of Rule 41 would not be applied to prohibit a sophisticated investigative technique merely because Rule 41 was drafted in terms of physical, rather than electronic, evidence."

The government stated in its first brief that its first application had been drafted in a manner "similar" to the manner in which an application under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Act of June 19, 1968, Pub.L. No. 90–351, 82 Stat. 197, must be drawn. The government argued that the form of its original affidavit and the procedure which it allegedly was following had been approved in *United States v. Brick* (8 Cir. 1974), 502 F.2d 219 and in *United States v. John* (8 Cir. 1975), 508 F.2d 1134.

After receipt of the government's first legal memorandum we invited Mr. Schulke to chambers to discuss the legal questions which had not been discussed in the government's brief. Both he and Michael DeFeo, Attorney in Charge, Kansas City Field Office, Organized Crime and Racketeering Section, Department of Justice, accepted our invitation and conferred informally with the Court. The Court advised government counsel that it did not read the cases cited in its original legal memorandum as authorizing the use of a pen register device unless such device was authorized as an incident of an order authorizing a wire interception under the exacting procedures mandated by Title III.

We frankly stated to government counsel that its original memorandum of law did not, in our judgment, appropriately cite or rely upon any source to establish this Court's power, jurisdiction or authority to issue the orders requested. Government counsel's attention was directed to *Weinberg v. United States* (2 Cir. 1942), 126 F.2d 1004, as an example of a case in which a particular district judge had attempted to enter an order which varied from the authority conferred by the then existing law.

We advised counsel that we had not had time to independently research the question and requested the submission of further legal authority. We asked whether the Department of Justice in Washington had briefed the question and were advised that the question had not been briefed in Washington and that no assistance could be obtained from that source. Mr. DeFeo advised the Court, however, that he agreed that the original memorandum of law submitted did not fully cover all of the questions presented and that a more adequate memorandum of law would promptly be presented to the Court.

On November 17, 1975, instead of submitting a more adequate memorandum of law as indicated, Mr. Schulke wrote the Court a letter in which he stated that the government had decided to withdraw its original application for a pen register device that had first been presented to this Court on November 3, 1975. Mr. Schulke closed his letter by stating "since this matter has been withdrawn, the government therefore requests return of its application, affidavits and two proposed orders which are presently in your custody." We immediately complied with the government's request and returned to Mr. Schulke the documents requested.

The papers presently before the Court establish that after the government withdrew its original application presented to this Court, it thereafter presented

an application for substantially the same orders, purportedly invoking power conferred by Rule 41, F.R.Cr.P., to Chief Magistrate Hamilton. Chief Magistrate Hamilton, however, entered an order, together with a short memorandum opinion, which denied that application. Chief Magistrate Hamilton concluded that the application, as presented, did not fall within the purview of Rule 41, F.R.Cr.P., and that, therefore, a conventional search warrant authorized by that rule could not be issued under the circumstances. He further concluded that he did not believe that he had authority under law to enter the orders presented with the application. The requested orders, of course, involved substantial modification of the warrant procedures mandated by Rule 41.

Sometime after Judge Hamilton's refusal to issue the requested order, the government indicated that it wanted to make a second application to this Court. We reminded Mr. Schulke that Mr. DeFeo had indicated that the only brief which the government had ever presented to this Court was not adequate to support the government's application and that the government should present a supplemental brief with its second application to this Court which would discuss all questions of law presented.

The government presented its second application, together with its new brief, on December 3, 1975. When it became apparent on December 4, 1975 that docket complications would prevent immediate consideration of the second application within the near foreseeable future, the Court directed Mr. Schulke to file all papers under seal with the Clerk so that the Court could, when time permitted, consider the government's second application and new brief.

Consideration of the government's new brief established that it was necessary to conduct independent research in regard to the questions presented. We find and conclude that this Court does not have jurisdiction or authority to issue the requested orders for reasons we shall state.

## II.

■ Both of the government's applications made to this Court and the application made to Chief Magistrate Hamilton recognize that "the propriety of [pen register] use depends on compliance with the Fourth Amendment." [2] The government's original application presented to

---

**2.** Footnote 4 of the dissenting opinion in *United States v. Giordano*, 416 U.S. 505, 554, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), suggests that the government may have argued in that case that "the use of a pen register may not constitute a search within the meaning of the Fourth Amendment." It is clear that no such argument is presented in this case. The government implicitly concedes in this case that the requirements of the Fourth Amendment must be satisfied, else it would not have presented its two applications to this Court and its application to Chief Magistrate Hamilton to issue a "modified" Rule 41 search warrant. It is therefore clear that, contrary to what the government may have argued in *Giordano*, the government's applications to this Court are based upon its recognition that the requirements of the Fourth Amendment must be satisfied. Such a view is, of course, consistent with *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and with the recent Fifth Circuit case, *United States v. Holmes* (5 Cir. 1975), 521 F.2d 859, decided October 8, 1975, but not yet officially reported, which concluded that the attachment of a hidden electronic "beeper" on an automobile was a search within the meaning of the Fourth Amendment in that a motorist parking his car in a public place can not be considered as losing his reasonable expectation against that kind of government electronic surveillance. *DiPiazza v. United States* (6 Cir. 1969), 415 F.2d 99, 103–104, involving long distance toll records kept by the telephone company in the usual course of business, concluded that "one who uses a telephone to make long distance calls is not entitled to assume that the telephone company will require a warrant before submitting its records in response to an IRS summons."

The government's position in this case reflects its apparent recognition that reasonable expectations of privacy in regard to the installation of a pen register device to record all telephone calls is a search which is more comparable to the installation of an electronic "beeper" than to the production of copies of the long distance toll charges, the originals of which every telephone subscriber regularly receives with his monthly telephone bill.

this Court was based on the notion that it did not need to identify any statute or rule of court to support its request that this Court design some sort of *ad hoc* procedures which could be said to satisfy the requirements of the Fourth Amendment. When this Court requested the government to present legal authority to support its position and to have the benefit of the views of the Department of Justice in Washington, the government withdrew its original application.

The government then presented a similar application to Chief Magistrate Hamilton, purportedly pursuant to power and jurisdiction authorized by Rule 41, F.R.Cr.P. In that separate proceeding, the government unsuccessfully attempted to satisfy the requirements of the Fourth Amendment by attempting to have Chief Magistrate Hamilton make some sort of an *ad hoc* modification of the express requirements of Rule 41 in order that the subjects of the investigation would be deprived of the safeguards accorded all persons against whom warrants may be issued in accordance with that Rule. Chief Magistrate Hamilton refused to make the modification requested by the government.

█ In making its second application to this Court, the government concedes that Chief Magistrate Hamilton has properly refused to issue its requested order under Rule 41. The government has also belatedly conceded in its new brief that it cannot put its finger upon the existence of any specific statutory authority or rule upon which its requested orders may be based. The government states its legal theory by saying that it "believes that the All Writs Act, 28 U.S.C. § 1651(a) provides authority for this Court to issue the requested order, particularly in view of the clear pronouncement in *United States v. John* that 'the propriety of their use depends upon compliance with the Fourth Amendment,' and the value of a detached antecedent judicial determination is evident before use of this type of device."

The government's attempted reliance upon dictum contained in *United States v. Brick,* 502 F.2d 219 (8 Cir. 1974) and dictum quoted from *United States v. John,* 508 F.2d 1134 (8 Cir. 1975) is untenable for the reason that in both those cases the Title III orders under consideration also authorized the use of a pen register in conjunction with the authorized wiretap. Indeed, Judge Heaney commenced his discussion of the pen register question in *John* with the factual recitation that "*in conjunction with each order authorizing the interception of wire communications,* the District Court issued an order authorizing the installation of a pen register on the telephones involved." [Emphasis ours]

While we quite agree that both *Brick* and *John* approved orders authorizing the use of a pen register device when issued in conjunction with a Title III order authorizing the interception of wire communications, we are convinced that the language of those cases cannot be stretched to validate the issuance of some sort of an *ad hoc* order to authorize the use of a pen register device independent of a proper Title III application and order. Cf. *Weinberg v. United States* (2 Cir. 1942), 126 F.2d 1004.

Every court which has directly considered the question has had no difficulty whatever in concluding that Title III is broad enough to authorize the use of pen registers when an application for such authority is made in conjunction with an application for a wiretap authorized by Title III. Most all of the cases, as do *Brick* and *John,* involve factual circumstances under which the Title III application for an order authorizing electronic surveillance included a request for *both* a wiretap and a pen register device. Every attack upon the authorized use of a pen register device under those circumstances has been determined to be without merit. See, for example, *United States v. Falcone* (3 Cir. 1974), 505 F.2d 478, 482, *cert. den.* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975), which goes so far as to hold that "an order permitting interception under Title III for a

wiretap provides sufficient authorization for the use of a pen register, and no separate order for the latter is necessary." To say that, of course, is not to say that a court has power and jurisdiction to authorize the installation of a pen register independent of the authority to authorize electronic surveillance as provided in Title III.

We do not, however, have a Title III application before us. What we do have before us is an application for some sort of an *ad hoc* authorization of the use of a pen register device in connection with an investigation of a possible violation of a statute which the Congress refused to include within the coverage of Title III. Indeed, we have an application which the government concedes is outside the coverage of Title III. The government's basic position in connection with its application is that in spite of the fact that the Congress did not include violations of §§ 7203 and 7262, Title 26, U.S.C., requiring the payment of a $500 special tax under the Federal Wagering Laws, within the coverage of Title III, the ancient All Writs Act nevertheless must be said to vest power and jurisdiction in a district court to design *ad hoc* procedures to authorize electronic surveillance in the form of the installation of a pen register device in connection with investigations of alleged violations of §§ 7203 and 7262. Indeed, the government's All Writs Act argument, if extended to its logical conclusion, would support the notion that all district courts have power and jurisdiction to authorize the use of pen register devices in connection with *any* investigation of *any* violation of the laws of the United States, regardless of the fact that the Congress may not have included the particular offense within the coverage of Title III.

The government's loosely-stated suggestion concerning "the value of a detached antecedent judicial determination" made in connection with the portion of its All Writs Act argument quoted above is more explicitly stated in connection with another matter on the same page of its new briefs. The government there suggests that it seeks what it calls "judicial guidance" in order that the agents of the Bureau of Alcohol, Tobacco and Firearms, United States Treasury Department, will obtain some sort of protection from the "dangers of possible civil and criminal liability under 18 U.S.C. §§ 2511 and 2520, and the theory of *Bivens v. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)."

Even if it could be assumed that the issuance of an order unauthorized by law may afford government agents some sort of a good faith defense in connection with civil or criminal proceedings which may be brought against them as provided in Title III, a question which we need not and do not answer, it should be obvious that basic questions of power and jurisdiction cannot be properly determined on the basis of trying to afford a government agent a defense in a civil or criminal action.[3] Questions of power and jurisdiction must be determined on the basis of Congressional action which has or has not been taken in regard to the subject matter of the particular question under consideration.

When the Congress enacted Section 2516, Title 18, U.S.C. of Title III it did not include the $500 special tax offense presently under investigation by ATF among the offenses for which the Attorney General, or any Assistant Attorney

**3.** It should be noted that the government's attempt to immunize its agents from civil and criminal liability under 18 U.S.C. §§ 2511 and 2520 is inconsistent with its implicit argument that pen registers are not governed by Title III procedures. Any liability under Sections 2511 and 2520 must be predicated on "interceptions" of wire or oral communications in violation of the procedures mandated in Title III. If, as the government implicitly contends, the use of a pen register device is not deemed an "interception" under the definition in Title III, and therefore could be authorized independently of Title III procedures, then Sections 2511 and 2520 would have no applicability and could not be invoked in the first place. Moreover, the order which the government seeks would seemingly afford little protection to those agents because Title III procedures have not been followed here and could not be followed under the factual circumstances involved in this proceeding.

specially designated by him, may authorize an application to a federal judge to obtain an order authorizing or approving the interception of wire or oral communications in conformity with the detailed procedural requirements of Section 2518 of Title III.

Section 2516 did, on the other hand, expressly include Section 1955, Title 18, U.S.C. (prohibition of business enterprises of gambling) within the coverage of Title III. Section 1955, however, defines an "illegal gambling business" to mean a "gambling business which . . . involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and . . . has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." The Special Attorney who is attempting to get orders authorizing ATF agents to use a pen register frankly advised the Court that ATF did not have any evidence which would support a finding of probable cause that Section 1955 is being violated. Section 2516, Title 18, U.S.C., does not authorize the Attorney General, or any Assistant Attorney designated by the Attorney General, to authorize an application to any federal judge for an order approving the interception of wire or oral communications in connection with any law relating to gambling, excepting only investigations for violations of Section 1955, Title 18, U.S.C. Section 1955, on its face, requires that the government must have probable cause to sustain a finding that the suspected gambling business under investigation is being conducted by five or more persons in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

While we quite agree with Chief Magistrate Hamilton's apparent conclusion that the data submitted by the Special Attorney and the ATF agent may be sufficient to support a finding of probable cause that the three individuals mentioned in those papers may be violating Sections 7203 and 7262, Title 26, U.S.C., we are required to find and conclude under the circumstances that the government does not even contend that it has presented sufficient data to sustain a finding of probable cause in connection with any suspected violation of Section 1955, Title 18, U.S.C.

When this Court requested the government to present a new brief to support what to this Court was a novel assertion of power, the government withdrew its application. The government's new brief added very little to its old brief other than the statement of its concession that Chief Magistrate Hamilton properly refused to make some sort of an *ad hoc* modification of the express requirements of Rule 41 in a manner which would prevent revelation of the fact a pen register had been installed on the various telephones mentioned in the ATF affidavit.

The government's new brief, of course, was written in obvious recognition of the fact that its second application to this Court would need to be based upon some legal authority other than Rule 41. The government's reliance upon the notion that power and jurisdiction is somehow vested in this Court under the All Writs Act, 28 U.S.C. § 1651(a), must be considered in light of the government's elimination of any other source of power and jurisdiction except that which it, at long last, contends is vested by the All Writs Act. The government's contention is obviously untenable.

### III.

The present form of the All Writs Act which presently appears as Section 1651(a) had its origin in the Judiciary Act of 1789. That section grants broad power to the Supreme Court and to "all courts established by Act of Congress" to issue common law writs of certiorari, prohibition, mandamus, injunctions pending appeal, and every other writ "necessary or appropriate in aid of [the] respective jurisdictions" of the particular federal court involved.

Familiar principles stated in cases such as *Brittingham v. U. S. Commissioner of Int. Rev.* (5 Cir. 1971), 451 F.2d 315, 317, need only to be stated in order to demonstrate that the government's All Writs Act contention is untenable. That case, as do many other cases, cites the leading Supreme Court and still other cases to support its statement of the following applicable general principles:

It is settled that this section, known as the All Writs Act, by itself, *creates no jurisdiction in the district courts. It empowers them only to issue writs in aid of jurisdiction previously acquired on some other independent ground.* [Emphasis ours] [Citations omitted]

This Court does not have any independent jurisdictional ground over the investigation which the government seeks to make of alleged violations of persons who may have willfully failed to file returns, keep records, or supply information to the United States Treasury in alleged violation of Sections 7203 and 7262, Title 26, U.S.C. Nor does the All Writs Act vest this Court with any independent jurisdictional power to design *ad hoc* procedures to authorize the use of a pen register device in connection with investigations of alleged offenses outside the scope of Title III. We accordingly find and conclude that under the general principles stated, the All Writs Act may not properly be said to vest this Court with power and jurisdiction to issue the order requested.

## IV.

The government's suggestions about its need for "judicial guidance" and "antecedent judicial determination" erroneously assume the existence of judicial power which is nonexistent. That assumption is predicated upon the notion that the judicial branch may properly construe legislation passed by the Congress in accordance with the policies a particular judge would have favored or opposed, had he been a member of Congress rather than a judge.

Established principles of statutory construction require courts to recognize that Congress does not legislate in a vacuum; Congressional legislation must be viewed in light of earlier legislation enacted in connection with the same subject matter and court decisions which have definitely determined the meaning and scope of that earlier legislation. Of particular significance, so far as Congressional action in regard to electronic surveillance is concerned, are the cases which considered whether pen register devices were within the coverage of Section 605, Title 47, U.S.C., which banned all forms of electronic surveillance. See *Nardone v. United States,* 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); *Weiss v. United States,* 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939); *Nardone v. United States, (Nardone II),* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); and *Benanti v. United States,* 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957). Every case which considered the precise question concluded that pen registers were embraced in the prohibition of Section 605. See Chief Judge Campbell's opinion in *United States v. Guglielmo,* (N.D.Ill.1965) 245 F.Supp. 534, affirmed *sub nom. United States v. Dote* (7 Cir. 1966), 371 F.2d 176 (opinion by Chief Judge Hastings), and *United States v. Caplan* (E.D.Mich.1966), 255 F.Supp. 805 (opinion by then District, now Circuit Judge McCree). We believe that it must be assumed that Congress knew that pen register devices were included within the coverage of Section 605 of the Communications Act of 1934 (47 U.S.C. § 605), and that it knew that unless the pen register was taken out of the ban of Section 605, the use of such a device would still be prohibited. Section 803 of the Omnibus Crime Control and Safe Streets Act amended Section 605 to clearly reflect that all electronic surveillance is now to be governed by Title III. Senate Report No. 1097, reprinted 2 U.S.C. Code Congressional and Administrative News, 90 Cong., 2d Sess. at 2196, stated:

Section 803.—This section amends section 605 of the Communications Act

of 1934 (48 Stat. 1103, 47 U.S.C. sec. 605 (1958)). This section is not intended merely to be a reenactment of section 605. The new provision is intended as a substitute. The regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code.

*United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) and *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) also reflect the fact that the Congress enacted a comprehensive and all-inclusive system of regulating *all* electronic surveillance by Title III of the Omnibus Crime Control Act. *Gelbard,* for example, contains the following summary of that Act:

> In Title III, Congress enacted a comprehensive scheme for the regulation of wiretapping and electronic surveillance. See *United States v. United States District Court,* 407 U.S. 297, 301–306 [92 S.Ct. 2125, 2128–2131, 32 L.Ed.2d 752]. Title III authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, an approval that may not be given except upon compliance with stringent conditions. 18 U.S.C. §§ 2516, 2518(1)–(8). If a wire or oral communication is intercepted in accordance with the provisions of Title III, the contents of the communication may be disclosed and used under certain circumstances. 18 U.S.C. § 2517. Except as expressly authorized in Title III, however, all interceptions of wire and oral communications are flatly prohibited. Unauthorized interceptions and the disclosure or use of information obtained through unauthorized interceptions are crimes, 18 U.S.C. § 2511(1), and the victim of such interception, disclosure, or use is entitled to recover civil damages, 18 U.S.C. § 2520. Title III also bars the use as evidence before official bodies of the contents and fruits of illegal interceptions, 18 U.S.C. § 2515, and provides procedures for moving to suppress such evidence in various proceedings, 18 U.S.C. § 2518(9)–(10). [408 U.S. at 46, 92 S.Ct. at 2360]

We recognize, of course, that the concurring and dissenting opinion in *Giordano,* 416 U.S. at 548, 94 S.Ct. 1820, suggested, by way of dictum, that pen registers are not governed by Title III:

> This conclusion rests on the fact that the device does not hear sound and therefore does not accomplish any "interception" of wire communications as that term is defined by 18 U.S.C. § 2510(4)—"the *aural* acquisition of the *contents* of any wire or oral communication through the use of any electronic, mechanical, or other device" (emphasis added). [Id. at 553, 94 S.Ct. at 1844]

We note that the term "contents," as quoted in *Giordano* is defined in Title III to include not only conversation, but also "any information concerning the identity of the parties to such communication or the existence . . . of that communication." 18 U.S.C. § 2510(8). The legislative history of that section states that:

> Paragraph (8) defines "contents" in reference to wire and oral communication to include all aspects of the communication itself. No aspect, *including the identity of the parties,* the substance of the communication between them, or *the fact of the communication itself,* is excluded. *The privacy of the communication to be protected is intended to be comprehensive.* [Emphasis ours] [2 U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess. (1968) p. 2179]

Mr. Justice Powell in his concurring and dissenting opinion in *Giordano* quoted that portion of S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), which stated that "the use of a 'pen register' for example, would be permissible." The substance of that language in the Senate Report had its origin in the last sentence of footnote 10 on page 662 of an article published in

43 *Notre Dame Law Review* 657 (1968), by G. Robert Blakey and James A. Hancock entitled "A Proposed Electronic Surveillance Control Act." Professor Blakey has frequently been noted to have been the primary author of Title III. See *United States v. Giordano,* 416 U.S. 505, 517, n. 5, 526, n. 16, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Footnote 10 of Professor Blakey's law review article, however, specifically added a "But see" citation of *United States v. Dote,* 371 F.2d 176 (7 Cir. 1966). That case, of course, is the leading case which held that a pen register device was within the coverage of Section 605.

The language of Title III, as enacted by the Congress, does not, in our judgment, reflect any acceptance of Professor Blakey's law review suggestion that "the proposed legislation is not intended to prevent the tracing of phone calls by the use of a 'pen register'—a device used to record the number dialed from a given phone." While we quite agree with the majority opinion's statement in *Giordano* that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 "is not as clear in some respects as it might be," [416 U.S. at 515, 94 S.Ct. at 1826], we are also convinced that the legislative history is equally ambiguous and that "this is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute" *Greenwood v. United States,* 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956), (per Mr. Justice Frankfurter).

It is for this reason that we look to the statute as enacted by the Congress, rather than to the doubtful language of the Senate Report, as that language was borrowed from a law review article.[4] It is clear that the language of Title III comprehends all forms of electronic surveillance, and the orders which the government seeks cannot be obtained independent of the procedures contained therein. We cannot believe from the language of the new Act that the Congress intended that an investigative tool as useful as a pen register device was to remain within the ban and coverage of old Section 605 and that a properly authorized application could not be made

---

**4.** We are, of course, familiar with the Law Review Note entitled "The Legal Constraints Upon the Use of the Pen Register as a Law Enforcement Tool," 60 Cornell L.Rev. 1028 (1975), apparently written by one of Professor Blakey's law student protégés. The note somewhat presumptuously suggested that "the Supreme Court twisted the meaning of section 605 in order to cover a criminal law enforcement context" [Id. at 1032], and that the decisions made by other courts, which he concedes are against his novel view, were reached only as a result of judges' predilection to forego "a proper statutory analysis in their willingness to twist the statute and thereby find it applicable."

It is clear that the author of the Note concedes that all pre-1968 cases, the date of Title III's enactment, concluded that pen register devices were within the coverage of Section 605. And in regard to the cases decided after Congress enacted Title III, it is stated that: "With respect to section 605 subsequent to 1968, lawyers and judges alike have, for the most part, considered the present section 605 to be no more than a modification of the prior provision and therefore continue to accord the pen register the same treatment as that found in pre-1968 cases," (Id. at 1035) and that:

"The almost uniform result in the cases that have considered section 605 has been to curtail the use of pen registers." (Id. at 1036).

We do not believe that the teaching of the cases, either before or after Title III's enactment, can properly be disregarded. It is simply no answer to say, as the student author suggests, that the cases should be ignored because "the policy approach apparently chosen by the courts to deal with pen registers reflects a generalized distaste for wiretaps" (Id. at 1037–1038). We simply cannot accept the notion that the judges who reached conclusions consistently contrary to that so zealously advocated by the author of the Note did so by having "grasped at any available argument to support their disposition and have accordingly created questionable precedents." (Id. at 1038).

Rather, we are convinced that familiar principles require that we conclude that Congress was familiar with and recognized the impact of the pre-1968 Section 605 pen register cases. We are also convinced that the post-1968 cases rest on the soundly reasoned basis that courts must apply what Congress said in Title III, rather than attempt to rely upon cryptic language in a law review article which happened to find its way into a Senate Report.

for an order authorizing the use of a pen register device in conjunction with an order authorizing the interception of other oral or wire interceptions in accordance with Title III.[5]

## V.

Independent research, made necessary by the superficial briefs submitted by the government in connection with the application involved in this case, reveals that this case is not the first case in which the government has attempted to secure *ad hoc* orders in connection with electronic surveillance techniques which were not expressly authorized by Title III. *Application of United States* (9th Cir. 1970) 427 F.2d 639, shows that the government attempted to convince Chief Judge Foley of the District of Nevada that he should, in connection with a Title III application seeking authority to intercept wire communications of particular named individuals, also issue a second order, not then authorized by Title III, to direct the officers of the Central Telephone Company of Nevada to serve and assist the Federal Bureau of Investigation in carrying out the interception applied for by the government.

Unlike this case, the procedures followed in *Application of the United States* resulted in Judge Foley having the benefit of something more than the government's *ex parte* presentation. After the benefit of an *in camera* hearing, and after consideration of the legal authorities presented by counsel for the telephone company, Judge Foley refused to issue the requested order, concluding that Title III did not expressly "authorize a judge to compel a communications carrier to serve and assist the Federal Bureau of Investigation in carrying out the interception of wire communications applied for by the Government and approved by a court." (Id. at 640–41). Judge Foley also concluded that "in view of this lack of authority, if the proposed order were signed and the company elected to comply therewith, the company or its officers and employees would be subject to prosecution for a gross misdemeanor under Nevada law, namely NRS 200.610–200.690." (Id. at 641).

The government appealed Judge Foley's refusal to issue the requested order.[6] The Ninth Circuit found it necessary to decide only the questions of (1) whether the order denying the requested application was subject to appeal; and (2) "Did the district court have authority, in the exercise of its discretion, to order the company to cooperate in the interception of wire communications, assuming approval of the proposed inter-

---

**5.** The effect of our decision does not suggest that pen register devices may not properly be authorized by law or that their use is to be discouraged. Pen register devices, by their very nature, constitute a lesser intrusion into the privacy of an individual than wiretaps. To say that the minimal intrusion may be authorized only by the procedures mandated for the maximum intrusion does not mean that a court should always authorize the maximum intrusion simply because that tool is available, or that minimal intrusions are to be discouraged.

We believe that the Congress placed the duty upon a district judge to whom an application for a Title III authorization to intercept is presented to give appropriate consideration to minimizing the intrusion into legitimate activity by requiring in section 2518(5) that "every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to this Chapter

. . . ." It may well be that a Title III order should, in the first instance, in a particular case, consistent with § 2518(5), permit only the installation of a pen register. We are not required, however, to reach that question by the government's application in this case because we do not have a proper Title III application before us.

The Congress, by its enactment of Title III, anticipated that such questions would arise primarily under circumstances in which the government sought a Title III authorization for both a wiretap and a pen register. The judgment of Congress, of course, is controlling.

**6.** The official report of *Application of United States, supra,* lists Michael DeFeo, U.S. Department of Justice, Washington, D.C., as one of the government counsel for the appellant. We do not jump to the conclusion that Mr. DeFeo was necessarily familiar with the existence of that case simply because his name apparently appeared on the brief. There is the possibility that Mr. DeFeo told Mr. Schulke about the case and that Mr. Schulke forgot

ception were granted the Government?" (Id. at 641).

Doubts were resolved in favor of appellate jurisdiction in light of the Ninth Circuit's conclusion (Id. 642), that "there is a substantial public interest in obtaining an early and authoritative determination of the unique and important questions presented on the merits, not only for the purpose of this case, but also for the general guidance of federal law enforcement agencies and, in the event amendatory legislation may be sought, for the assistance of the Congress."[7]

In *Application of United States*, as in this case, the government acknowledged "that Title III of the Act contains no specific provision conferring . . . power" to issue the order requested of Judge Foley. (Id. 642). The government contended that power and jurisdiction to issue the requested orders nevertheless could be based upon either the ancient principle of *posse comitatus* or upon the All Writs Act.[8] The Ninth Circuit concluded that neither notion could be relied upon to sustain the jurisdiction and power of the district court to issue the requested order. For, the Ninth Circuit could not find "outside Title III, any district court authority, statutory or inherent, for entry of such an order." (Id. 644).

The Ninth Circuit considered it important "for the general guidance of federal law enforcement agencies" to set forth the considerations which control the construction of statutes which permit the authorization of electronic surveillance.

That court correctly anticipated the Supreme Court's later opinion in *Gelbard v. United States, supra*, by holding that:

> Title III . . . purports to constitute a comprehensive legislative treatment of the entire problem of wiretapping and electronic surveillance, complete with extensive introductory Congressional findings. The provisions contained in Title III state, in precise terms, what wiretapping and electronic surveillance is prohibited, and what is permissible. As to the latter, meticulous provision is made with respect to the necessity and manner of obtaining prior or subsequent judicial approval, the use which may be made of intercepted information, the way in which aggrieved persons may test the validity of the interception, and the collection and transmission to Congress each year of information concerning such activity. [427 F.2d at 643]

The court stated and applied familiar principles applicable to this case when it added that:

> In view of the breadth and apparent selfsufficiency of this general statute, and the total absence of any provision even hinting that the court is to have authority to enter such a unique order as the Government here seeks, we think the existence of such authority is not lightly to be implied from the Act. Nor do we find any provision in the Act, or in the history of its enactment, which points in the direction of implied authority. Quite to the contrary, consideration of the constitutional sig-

---

about it. We have neither the judicial time nor inclination to make further inquiry into the matter. We do believe that something is amiss with Department of Justice procedures under which cases as close as *Application of United States* are not called to the court's attention in connection with an *ex parte* application which relies solely on the All Writs Act to support the power and jurisdiction of the district court. See *Berger v. United States*, 295 U.S. 78 at 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

**7.** It is interesting to note that Congress acted promptly in regard to the question decided in

*Application of United States*. The decision in that case was handed down on May 18, 1970. The Congress promptly amended Section 2518(4) of Title III on July 29, 1970 by adding what is now paragraph (e) of that section by attaching that amendment as a rider on the District of Columbia Court Reform Act. See U.S.Code Congressional and Administrative News, 91st Cong., 2d Sess. (1970). pp. 769 and 785.

**8.** The government did not present its *posse comitatus* argument to this Court. It has apparently concluded that what the Ninth Circuit said about that notion in *Application of United States* was correct.

nificance of the legislation, the relevant provisions of the Act, and the legislative history tend in the opposite direction. [Id. 643]

The court added and applied still another familiar rule of statutory construction which comes into play where Constitutional considerations lurk close to the surface of a particular statute. It stated that:

Title III deals with a subject which directly affects the right of privacy in the matter of telephone communications, a right protected under the Fourth Amendment. See *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). If the Act is to survive a constitutional challenge, a question which we do not here reach, it can only do so by giving the Act as limited a construction as is warranted by the language used. The construction which the Government would give Title III, however, whereby an important judicial power not expressly provided for, would be implied, manifests not a limited, but an expansive, reading of the Act. (Id. 643).

For all the reasons stated, we expressly refuse to issue the orders requested by the government. We are convinced that Congress has not conferred power and jurisdiction on this Court to authorize the use of an electronic surveillance device in the form of a pen register in connection with the investigation of an offense admittedly not within the coverage of Title III. We refuse the government's request that we issue orders which neither the Congress nor any Rule of Criminal Procedure has authorized.

## VI.

When the pending application was presented to this Court the first time, we made inquiry of the Special Attorney whether we could obtain the views of the Department of Justice in Washington. We were advised that this was impossible and that, as a matter of fact, the Special Attorneys in this district would not know whether their superiors in Washington may or may not agree with the theories presented to this Court until this Court had indicated its view under the circumstances.

We suggested then and reiterate now that there ought to be a better way to test the legal questions presented. It is obvious that a test case, which would reflect the considered and official view of the Department of Justice in Washington, could be prepared and presented in order that a final definitive decision could be obtained upon which a judgment could be made in regard to whether additional Congressional authority should be sought under the circumstances.

This Court, unlike the courts involved in *Application of the United States*, has been forced to conduct its own independent research in connection with what it deems to be an important question which could have a broad effect on the administration of federal criminal justice. We do not believe that such cases should be presented to a busy district court on an *ex parte* basis unless the government, acting with the official approval of the Department of Justice in Washington, is prepared to assure the Court that it has cited all cases which have dealt with the questions presented in all federal courts throughout the country.

The government, in apparent anticipation of the possibility of seeking appropriate appellate review, if eventually authorized in Washington, stated in one of its briefs that "if this Court determines that it lacks jurisdiction to authorize the use of a pen register device that has been requested by the Government's application, the Government would then ask the Court to make a finding by written order as to the lack of jurisdiction question and as to whether the Government has sufficient probable cause to justify the pen register device concerning the criminal matter under investigation." The orders we will enter will comply with that request. We believe, however, consistent with the practice followed in *Application of the United States, supra*, and that followed by Chief Magistrate Hamilton, that all papers

other than this memorandum opinion and the orders entered in connection therewith should be placed under seal until further order of this Court or whatever appellate court which may later entertain jurisdiction under the circumstances.

For the reasons stated, it is

Ordered (1) that the orders requested in the government's application should not and will not be issued. The government's requests in that regard are expressly denied. It is further

Ordered (2) that the government has not established, indeed, it has not even attempted to establish, probable cause to support the authorization of the use of a pen register device in connection with the investigation of any offense within the coverage of Title III of the Omnibus Crime Control Act. It is further

Ordered (3) that the establishment of probable cause in connection with the investigation identified in the government's application, presently being conducted by the Bureau of Alcohol, Tobacco and Firearms, United States Treasury Department, is immaterial for the reason that no jurisdiction, power or authority, other than Title III has been conferred upon this Court by Act of Congress or Rule of the Supreme Court of the United States to issue the orders requested in the government's application. For purposes of possible appeal, however, we state our agreement with Chief Magistrate Hamilton's conclusion that probable cause, in the abstract, could be said to be established by the government's application and supporting affidavits in regard to an offense not covered by Title III. It is further

Ordered (4) that all papers filed in connection with the government's application, excepting only this memorandum opinion and the orders hereby entered, shall be retained by the Clerk under seal and protective order until further order of this Court or of an appropriate appellate court. The Clerk shall, of course, promptly comply with the order of any appellate court should the government seek appropriate appellate review. The Clerk of this Court shall also advise the Clerk of the Court of Appeals or of any other appellate court of the protective order which has been entered by this Court, should the government seek appropriate appellate review. We trust that all appellate courts will enter any further protective orders which may be deemed appropriate under the circumstances.