# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 25, 2025

Lyle W. Cayce
Clerk

———————————

No. 24-10271

———————————

David Bakutis, *as Temporary Administrator for* the Estate of Atatiana Jefferson,

*Plaintiff—Appellee*,

*versus*

Aaron Dean,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CV-665

———————————————————————

Before Ho, Engelhardt, and Douglas, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

Aaron Dean appeals the district court's judgment denying qualified immunity. We AFFIRM the district court's judgment as to the excessive force claim, but we REVERSE and REMAND on the unreasonable search claim.

## I.

On October 12, 2019, at 2:25 a.m., the Fort Worth Police Department received a phone call from one of Atatiana Jefferson's neighbors. The neighbor told the police that he was concerned that Jefferson's front door

No. 24-10271

was open. The neighbor also explicitly said that Jefferson's door is usually closed. This sort of report is known as an "open structure call."

Dean responded to the call and arrived at Jefferson's home at 2:28 a.m.[1] Another police officer arrived shortly after Dean at 2:29 a.m. Following Department protocol, both officers parked around the corner out of view of the residence, and neither activated their emergency lights or sirens. The rationale behind such a protocol is to avoid notifying a potential burglar that the police are on the scene.

After arriving at the home, the officers approached the residence and looked through the front door's screen window. Then, they walked around the house and looked through a screen door on the side of the home. The officers continued to walk around the house and use their flashlights to look for signs of a break in. They also checked the cars in the driveway and the garage, which they found closed. The officers finished the perimeter sweep by opening a gate on the side of the home and shining Dean's flashlight through a window to look for a disturbance.

Around 2:30 a.m., Jefferson became aware that someone was outside her home. Unbeknownst to the officers, Jefferson was home watching her nephew. Jefferson and her nephew stayed up late playing video games and opened the door to let a breeze into the house. When Jefferson realized someone was outside, she stood up and walked to the window to look outside. She had no way of knowing it was the police and not an intruder outside of her home at this early hour of the morning.[2]

_____

[1] Dean was a police officer on October 12, 2019. He has since resigned from the Fort Worth Police Department.

[2] Without discovery, it is unclear whether Jefferson had a gun or other weapon in her hand when she went to the window. The complaint does not allege that Jefferson did,

No. 24-10271

When Jefferson's figure appeared at the window, Dean pulled out his gun and pointed it at the window. Allegedly, Dean's view of Jefferson was obstructed by the reflection of his flashlight. When Dean raised his gun he still did not announce himself as an officer. Instead, he said "Put your hands up! Show me your hands!" But before finishing this command, he fired a shot through the window which struck Jefferson.

Then, both officers entered the home and attempted to give CPR to Jefferson. Jefferson was pronounced dead at 3:05 a.m. The blood loss from the gunshot wound killed her.

Bakutis, as administer of Jefferson's estate, sued Dean.[3] Dean moved to dismiss, asserting qualified immunity. Dean also moved to stay discovery. The district court stayed discovery for all parties, denied "without prejudice" the motion to dismiss, and directed Bakutis to file an amended complaint. Bakutis filed a Second Amended Complaint. Dean again asserted qualified immunity and moved to dismiss. The district court denied Dean's motion. Dean timely appeals.

## II.

A district court's denial of a motion to dismiss on grounds of qualified immunity is a collateral order that this court can immediately review. *See* 28 U.S.C. § 1291; *see also Carswell v. Camp*, 54 F.4th 307, 312 (5th Cir. 2022).

This court reviews the district court's judgment *de novo*. *See Hyatt v. Thomas*, 843 F.3d 172, 176 (5th Cir. 2016). It is the plaintiff's burden to demonstrate that qualified immunity is inappropriate. *See Smith v. Heap*, 31

---

or did not, have a weapon. But the complaint does allege that no weapon was pointed at the officers.

[3] Bakutis also sued the City of Fort Worth, but the City is not a party to this appeal.

3

F.4th 905, 910 (5th Cir. 2022). Our inquiry is "whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983 . . . and would overcome their qualified immunity defense." *Hinojosa v. Livingston*, 807 F.3d 657, 664 (5th Cir. 2015).

## III.

Qualified immunity "shields public officials sued in their individual capacities from liability for civil damages [under § 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known." *Kokesh v. Curlee*, 14 F.4th 382, 391 (5th Cir. 2021) (cleaned up). That inquiry breaks down into two prongs: (1) whether an official violated a constitutional right and (2) whether that right was clearly established at the time of the official's challenged conduct. *See Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017).

Courts have discretion to choose which prong to decide first, and whether to address the first prong at all. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *see also Trent v. Wade*, 776 F.3d 368, 377 (5th Cir. 2015); *Roque v. Harvel*, 993 F.3d 325, 332 (5th Cir. 2021). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Richle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up); *see Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). The critical question is "whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Singleton v. Cassanova*, No. 22-50327, 2024 WL 2891900, at *8 (5th Cir. June 10, 2024) (quoting *Roque*, 993 F.3d at 334).

## A.

When Dean responded to the "open structure call" he was performing a community caretaking function. Community caretaking functions are "totally divorced from the detection, investigation, or acquisition of evidence

relating to the violation of a criminal statute." *United States v. York*, 895 F.2d 1026, 1030 (5th Cir. 1990) (internal quotations omitted). Here, even if the officers suspected criminal activity such as a burglary, the police were not searching Jefferson's property or home to find evidence of a crime committed by its residents. After all, one cannot burglarize, or criminally trespass on, his own home. Instead, the police were exercising a community caretaking function—checking to make sure Jefferson and the other residents of the home were safe. Because Dean was exercising a community caretaking function, it is not clearly established that Dean's actions were an unreasonable search.

There is no standalone community caretaking doctrine that exempts all searches and seizures in the home from the Fourth Amendment. *Caniglia v. Storm*, 593 U.S. 194, 196 (2021). Within the broad category of community caretaking, the functions performed by police vary greatly and the Fourth Amendment's reasonableness may not apply the same way to each of the community caretaking functions. *Id.* at 200 (Alito, J., concurring). So each community caretaking function must be evaluated independently. Neither the U.S. Supreme Court nor this court has any precedent on "open structure calls," so there is no clearly established law that would have given a reasonable officer in Dean's position fair notice that his actions in response to the "open structure call" were unreasonable.[4]

---

[4] In separate writings, the U.S. Supreme Court Justices recently debated whether a search while performing a community caretaking function should be evaluated under the same reasonableness standard as a criminal law enforcement search. One Justice argued that a search occurring in the course of community caretaking is distinct from criminal law enforcement searches because "warrants are not typically granted for the purpose of checking on a person's medical condition" or general welfare, and exigent circumstances only exist "when there is not enough time to get a warrant." *Caniglia*, 593 U.S. at 203 (Alito, J., concurring). So, "[w]hile there is no overarching 'community caretaking' doctrine, it does not follow that all searches and seizures conducted for non-law-enforcement purposes

No. 24-10271

Most of the cases Bakutis cites to defeat qualified immunity for the Fourth Amendment search claim involve police performing traditional law enforcement functions. Again, traditional law enforcement directed toward an accused perpetrator is different from community caretaking. For example, Bakutis cites *Florida v. Jardines*, where the Supreme Court held that officers could not enter the curtilage of a home (there, the porch) with a drug sniffing dog and investigate an unverified tip that marijuana was being grown inside the home. 569 U.S. 1, 3 (2013). The function of that search was to uncover criminal activity presumably perpetrated by the home's residents. Because this case involves a community caretaking function, *Jardines* does not directly govern.[5]

The primary non-criminal law enforcement case Bakutis relies on is *Linicomn v. Hill*. 902 F.3d 529, 538 (5th Cir. 2018). In that case, a mother who had lost custody of her children and had a history of making exaggerated

---

must be analyzed under precisely the same Fourth Amendment rules developed in criminal cases. Those rules may or may not be appropriate for use in various non-criminal-law-enforcement contexts." *Id.* at 201—02. In contrast, another Justice suggested that community caretaking functions fall within the exigent circumstances structure that exists for criminal law enforcement searches. "[T]he Court's exigency precedents, as I read them, permit warrantless entries when police officers have an objectively reasonable basis to believe that there is a current, ongoing crisis for which it is reasonable to act now." *Id.* at 206 (Kavanaugh, J., concurring). *Caniglia* exemplifies that there is no clearly established law for what is reasonable under the Fourth Amendment when an officer is performing a community caretaking function generally. And there is no caselaw at all on the community caretaking function of responding to an "open structure call." The dissent suggests that the majority opinion is evaluating Dean's actions using the criminal law enforcement reasonableness framework. This is incorrect. The majority opinion does not take a position on whether an officer performing a community caretaking function should be judged under the same reasonableness standard as is applied to a criminal law enforcement search.

[5] Likewise, the other binding cases Bakutis cites, including *Brock v. United States*, 223 F.2d 681, 685 (5th Cir. 1955), and *State of Tex. v. Gonzales*, 388 F.2d 145, 146-47 (5th Cir. 1968), involve warrantless searches of the home for criminal law enforcement purposes.

claims about her children's welfare, called in a disturbance relating to her children who were at her ex-husband's house. *Id.* at 533–34. The ex-husband answered the door and stated that his children were asleep and did not need medical assistance. *Id.* at 534. Yet, the police entered the home without a warrant. *Id.* The panel held that the husband's constitutional rights were violated because the police failed to corroborate the ex-wife's call and "the officers had the burden of proving the existence of exigency." *Id.* at 537. But ultimately, qualified immunity was preserved because it was not clearly established whether the use of force was reasonable in response to a call claiming a child could be physically ill. *Id.* at 539.[6] Bakutis now alleges that *Linicomn* clearly established that Dean needed to corroborate the neighbor's phone call before searching the curtilage of the home.[7] But the U.S. Supreme Court has held that whether a law is clearly established is a fact-specific inquiry. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The facts in *Linicomn* are different than here in material ways. The police were not conducting the same community caretaking function in this case as in *Linicomn*. There, the wife's call raised suspicion that the *father* was endangering the children, and the police searched the *father*'s home. Yet here, a home intruder cannot burglarize his own home. The suspected criminal is not the owner or resident of the home. So even if the suspected crime was a burglary or some other criminal trespass, the effective function

---

[6] Bakutis incorrectly states that qualified immunity was denied.

[7] While it is not clearly established that the officers needed to corroborate the open structure call, unlike in *Linicomn*, the officers here did corroborate the call when they arrived on the scene. In *Linicomn* the police saw no evidence that the father was endangering his children when they arrived at the home. They did not corroborate the mother's phone call. In contrast, when the officers arrived at Dean's home they corroborated the neighbor's phone call by confirming there was an open door and conducting a perimeter sweep.

of the supposed search by the officers was a welfare check on the home's residents—it was not a search of the suspected criminal's home to uncover his or her suspected criminal activity. *Caniglia* emphasizes that all community caretaking functions cannot be treated the same for qualified immunity purposes.[8]

Bakutis fails to cite any case that governs the facts here and holds that sufficiently similar conduct violates the Constitution. Yet to prevail, he must meet his burden to demonstrate that a "right was clearly established . . . in light of the specific context of the case." *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (internal quotation marks omitted). The district court got that standard exactly backwards, reasoning that because the *defendant* does not cite binding, precedential caselaw that responding to a suspected burglary alone allows an officer to enter the curtilage of a home, qualified immunity was not warranted. Instead, it is the plaintiff, Bakutis's, burden to produce binding caselaw establishing that Dean's perimeter sweep of the home in response to an "open structure call" was objectively unreasonable under the Fourth Amendment. Because there is no clearly established precedent that Dean's actions were unreasonable, he was not given "fair notice" that his actions were unreasonable. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see Roque*, 993 F.3d at 334. Dean is entitled to qualified immunity, and his motion to dismiss the unreasonable search claim should be granted. We REVERSE the district court on this point.

---

[8] The emergency aid cases Bakutis cites are similarly factually distinct. *See Brigham City v. Stuart*, 547 U.S. 398, 400 (2006) (holding that when police were at a home responding to a reported noise complaint and witnessed a violent altercation, they were justified to enter the home); *see also United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) (holding that Border Patrol agents could not enter a home without a warrant to arrest the owner for conspiracy to transport an alien, absent an exigency).

No. 24-10271

## B.

Excessive force claims are properly analyzed under the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1998). Whenever an officer restrains the freedom of a person to walk away, he has seized that person. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975). There is no question that apprehension by the use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). It is undisputed that here there was apprehension by deadly force. [9]

A reasonable officer in Dean's position had "fair notice" that, without giving a warning, he could not use deadly force against Jefferson. *Brosseau*, 543 U.S. at 198. "[T]he Supreme Court's jurisprudence, as well as our own, ha[s] repeatedly declared the use of deadly force to be objectively reasonable—for Fourth Amendment purposes—*only* when the officer has probable cause to believe that the suspect poses an immediate and significant threat of death or serious physical injury to the officer or others and, if feasible, has given the suspect prior warning." *Singleton*, 2024 WL 2891900, at *13. In *Singleton*, this Court denied summary judgment based on qualified immunity when the officer failed to identify himself as "police" despite clearly established law requiring him to provide a warning before shooting, when feasible.[10] In *Garner*, the U.S. Supreme Court held that burglary does not automatically justify the use of deadly force. 471 U.S. at 7. In *Cole v. Carson*, this court held that a warning needed to be given before the use of deadly force even when there was a mentally ill individual with a weapon who had made

---

[9] It appears Dean thought Jefferson was a burglary suspect.

[10] Even though *Singleton* was decided in 2024, it evaluated what was clearly established law in 2018. Thus, that law applies here where the question is what was clearly established law in 2019.

9

violent threats and was moving towards a school. 935 F.3d 444, 451 (5th Cir. 2019), *as revised* (Aug. 21, 2019). Because it was disputed whether the officers warned the suspect before using deadly force, this court held that a reasonable jury could conclude that the suspect was not given an opportunity to disarm himself before he was shot, so qualified immunity was not granted on the excessive force claim at the summary judgment stage. In *Baker v. Putnal*, there was chaos on a beach, a report of someone with a shotgun, followed by gunfire. 75 F.3d 190, 193 (5th Cir. 1996). Members of the public directed the officer to a vehicle allegedly occupied by the gunman. The officer approached the truck, the alleged gunman turned towards the officer, and the officer shot the passenger. It is disputed whether any warning was given and whether the gunman was holding the gun and pointing it at the officer when the officer approached the truck. This court did not grant qualified immunity at the summary judgment stage. *Id.* at 200.

Here, Jefferson was watching her nephew and heard someone outside of her home in the middle of the night. She, unsurprisingly, walked to the window to see who was there. Nothing suggests that Jefferson knew the police were at her home. Jefferson was not fleeing from the police. There is no allegation that she was violent or aggressive. And Dean does not assert that he believed Jefferson posed an immediate and significant threat to him or others. He does not allege that he saw her holding a weapon.[11] Under these circumstances, it is clearly established that Dean was required to announce himself as an officer and issue a warning, prior to employing deadly force. *See, e.g., Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed,

---

[11] Without discovery, we cannot say that Jefferson was armed. "Whether the suspect is armed is often the key factor in determining if a threat to an officer justifies the use of deadly force." *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021). However, "[e]ven when a suspect is armed, a warning must be given, when feasible, before the use of deadly force." *Id.*

nondangerous suspect by shooting him dead."); *Allen v. Hays*, 65 F.4th 736, 744–45 (5th Cir. 2023). Based on the current record, every reasonable officer would have known that it is objectively unreasonable to shoot someone under these circumstances. At the 12(b)(6) stage we AFFIRM the district court's denial of Dean's motion to dismiss because of qualified immunity.

This does not foreclose Dean from re-asserting qualified immunity at the summary judgment stage or even at trial, if facts reveal that deadly force might have been objectively reasonable and a warning could not be given. *See Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004); *Singleton*, 2024 WL 2891900, at *15–16. There are a number of key facts unknown at this stage, including whether Jefferson was holding a weapon. A defendant's request for qualified immunity should be granted at the earliest possible stage of litigation, but only if he is entitled to it. *See Cole*, 935 F.3d at 457. Dean may *ultimately* be entitled to prevail against the plaintiff regarding the objective reasonableness of his conduct, but not on the record we have upon this 12(b)(6) motion.

## IV.

We AFFIRM the district court's judgment on the excessive force claim, and REVERSE the district court's judgment on the unreasonable search claim. We REMAND the case to the district court for further proceedings consistent with this opinion.

No. 24-10271

DANA M. DOUGLAS, *concurring in part and dissenting in part*

I agree that Dean's actions, as alleged, constituted an unconstitutional seizure by deadly force. However, the allegations also demonstrate that after failing to corroborate that an armed burglary was in progress, and in fact seeing no signs of a forced entry, Dean illegally entered the curtilage of Jefferson's home in violation of the Fourth Amendment. Because his actions, as alleged, are not protected by qualified immunity, I respectfully dissent in part.

I

"At the motion to dismiss stage, we take the facts, as alleged or admitted by [Bakutis], as true." *Linicomn v. Hill*, 902 F.3d 529, 533 n.1 (5th Cir. 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 589 (2007)).

On October 12, 2019, Atatiana Jefferson was watching her nephew as they spent a late night playing video games together. Hoping to cool off the house, she opened the front door. Because the door was usually closed, and because it was 2:25 a.m., a neighbor called the Fort Worth Police Department to report an "open structure." In response, the Fort Worth Police Department, which treats "open structure" calls as silent alarm trips (and therefore burglaries in progress), dispatched two officers to the scene.

Dean was one of the two officers. He parked his patrol car around the corner and out of view of the residence without activating his lights. Upon arriving at the home, the officers approached the residence and looked through the front door's screen window. Finding no evidence of a disturbance, they walked around the corner of the home and looked for signs of a break-in through another screen door. Once again, they found no evidence of a forced entry; instead, they noticed cars in the driveway and a closed garage.

No. 24-10271

At this point, with no evidence of a forced entry, the officers opened a gate on the side of the home and proceeded down the alleyway. While walking along the side of the home, Dean shone his flashlight through a window. Jefferson, hearing a commotion, walked to the window to look outside. Dean saw Jefferson's figure in the window and drew his weapon. Before completing his command that Jefferson put up her hands, and without announcing his status as an officer, Dean fired his pistol, striking Jefferson. The officers entered the home and attempted to provide CPR, but Jefferson was pronounced dead at the scene at approximately 3:05 a.m.

## II

For Bakutis to overcome an assertion of qualified immunity, he must show (1) that there was a violation of a constitutional right and (2) that the right was clearly established at the time of the official's challenged conduct. *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017).

## A

I first address the majority's label of this search as a "community caretaking" search, before turning to the constitutionality of the search in general.[1]

---

[1] The majority rightly characterizes this activity as a search. "Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his 'right to be let alone' as guaranteed by the Fourth Amendment." *Brock v. United States*, 223 F.2d 681, 685 (5th Cir. 1955) (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)); *see also California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The claimed area here was immediately adjacent to a suburban home, surrounded by high double fences. This close nexus to the home would appear to encompass this small area within the curtilage.").

No. 24-10271

1

The majority labels Bakutis's actions as a "community caretaking" search, but that determination is in clear tension with Supreme Court precedent.

The Supreme Court first recognized "caretaking" searches in *Cady v. Dombrowski*, 413 U.S. 433 (1973). There, an off-duty Chicago police officer was involved in an accident and, upon arrival of officers, was unable to produce the service revolver he was required to carry at all times. *Id.* at 436. The officers searched the vehicle—which remained in the road—for the gun. *Id.* The driver ultimately challenged this search, which linked him to a nearby homicide, through a petition for writ of habeas corpus. *Id.* at 434, 438–39. The Supreme Court held that the search did not violate the Fourth Amendment. *Id.* at 447–48. Instead, it stated:

> The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking "search" conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained.

*Id.* It specifically noted that the officers "were simply reacting to the effect of an accident—one of the recurring practical situations that results from the operation of motor vehicles and with which local police officers must deal every day." *Id.* at 446; *see also id.* at 447 (noting that the justification for the search was "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle"). The Court extended the doctrine no further.

In *Caniglia v. Strom*, 593 U.S. 194 (2021), the Court revisited this doctrine and re-emphasized its limited applicability. There, the First Circuit,

14

No. 24-10271

"[c]iting [the Supreme] Court's statement in *Cady* that police officers often have noncriminal reasons to interact with motorists on 'public highways,' . . . extrapolated a freestanding community-caretaking exception that applies to both cars and homes." *Id.* at 197 (citation omitted) (quoting *Cady*, 413 U.S. at 441). But as the Supreme Court pointed out on review, "the location of [the *Cady*] search was an impounded vehicle—*not a home*—'a constitutional difference' that the opinion repeatedly stressed."[2] *Id.* at 199 (emphasis added) (quoting *Cady*, 413 U.S. at 439). Indeed, as Justice Thomas noted, "*Cady* expressly contrasted its treatment of a vehicle already under police control with a search of a car 'parked adjacent to the dwelling place of the owner.'" *Id.* (quoting *Cady*, 413 U.S. at 446–48). *Caniglia* acknowledged that while there are non-criminal community caretaking functions, "such as providing aid to motorists," *Cady* merely "recogni[zed] that these tasks exist" and did not create "an open-ended license to perform them anywhere." *Id.*

The majority errs by extending the community caretaking doctrine beyond the bounds of precedent. In *Caniglia*, the Court's majority opinion suggested only that community caretaking includes "providing aid to motorists." *Id.* But the majority avoids this precedent and, in doing so, reaches a circular conclusion.[3] It states that "even if the officers suspected

---

[2] Of course, "the area 'immediately surrounding and associated with the home'— what our cases call the curtilage—[is] 'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

[3] To the extent that the majority argues that the *Caniglia* concurrences extend the community caretaking doctrine beyond vehicles, *see ante*, at 6 n.4, this argument overlooks that the concurrences contemplated extending the doctrine in exceedingly limited circumstances. Chief Justice Roberts considered preventing violence in the context of emergency aid. *Id.* at 200 (Roberts, C.J., concurring). Justice Alito discussed situations such as "preventing a person from committing suicide," the seizure of guns to prevent use for suicide or harming innocent individuals, and "ascertaining whether a resident is in

criminal activity such as a burglary, the police were not searching Jefferson's property or home to find evidence of a crime committed by its residents" because a resident cannot burglarize themselves. *Ante*, at 5. Therefore, the argument goes, this must be community caretaking.

That the facts did not ultimately reveal a crime does not mean that Fourth Amendment rights disappear. "[T]he right to protection against unreasonable search or seizures . . . belongs to the guilty as well as the innocent." *Brock*, 223 F.2d at 684; *see also Soldal v. Cook County*, 506 U.S. 56, 67 (1992) ("Indeed, [the court of appeals] acknowledged what is evident from our precedents—that the [Fourth] Amendment's protection applies in the civil context as well [as the criminal context]."). The majority's bifurcation of the Fourth Amendment between searches that ultimately reveal criminal activity and those that do not finds no support in our precedent or in constitutional law.

Even assuming *arguendo* that this search did fall within the community caretaking exception,[4] this exception is still subject to a typical Fourth

---

urgent need of medical attention and cannot summon help," such as when an elderly family member is unreachable for a long period of time. *Id.* at 201–02 (Alito, J., concurring). And Justice Kavanaugh's examples included "prevent[ing] a suicide or . . . conduct[ing] a welfare check on an older individual who has been out of contact." *Id.* at 205 (Kavanaugh, J., concurring). It is clear to me that none of these examples squares with the situation at hand here: an "open structure" call that the police force treats as a burglary-in-progress call. More importantly, the concurrences do not reshape the Court's majority opinion, which expressly declined to extend the doctrine to homes. *Id.* at 199 (majority opinion).

[4] The facts do not demonstrate a community caretaking search in the first place. The officers entered the property not with the intent of knocking on the home and ensuring that everybody was safe but as though the home was potentially being burglarized. A community caretaking check would not endorse creeping around the side of a home and drawing a gun. And the mere fact that the call was placed on a non-emergency line does not mean that the activity was non-criminal, especially given the departmental policy of how to treat open structure calls.

Amendment analysis. Indeed, "these 'caretaking' duties [do not] create[] a standalone doctrine that justifies warrantless searches and seizures in the home." *Caniglia*, 593 U.S. at 196. Instead, the Court actively *limited* the exception, opining that even if the exception is proper for *vehicles*, the Supreme Court has "repeatedly 'declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home.'" *Id.* at 199 (alteration in original) (quoting *Collins v. Virginia*, 584 U.S. 586, 595 (2018)). Yet here the majority does exactly that. Accordingly, a Fourth Amendment inquiry would still be necessary.

2

Because this "open structure" call—which was treated as a burglary-in-progress—is subject to typical Fourth Amendment protections, the question is whether the officers unreasonably searched the area. As is well known, the Fourth Amendment protects against unreasonable searches and seizures, U.S. CONST. amend. IV, and a warrantless search of a home is presumptively unreasonable, *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Of course, "[t]his right would be of little practical value if the State's agents could stand in a home's porch or side garden." *Jardines*, 569 U.S. at 6. It would significantly diminish the right to retreat "if the police could enter a man's property to observe his repose from just outside the front window." *Id.* Accordingly, the curtilage, or the area "immediately surrounding and associated with the home," is considered "part of the home itself for Fourth Amendment purposes." *Id.* (quoting *Oliver*, 466 U.S. at 180).

Consider the facts in this case. The officers were told only that the front door was open; no other fact raised suspicion. They had no warrant. When they arrived, they "approached the home and looked through the screen window at the front door." They provided no notice of their presence.

Dean then walked to the other side of the home and looked through another screen door. He walked to the driveway and looked in the cars, where they found "no signs of a disturbance." As with the cars, the garage—which was closed—showed no evidence of a disturbance, and the fence next to the garage was closed. At this point, Dean, with no evidence of a disturbance, opened the fence gate, walked along the side of the home, and shined his flashlight into a window.

Dean acted without a warrant, so his conduct violated the Fourth Amendment unless an exception to the warrant requirement applied. As noted above, "clear it is that standing on a man's premises and looking in his bedroom window is a violation of his 'right to be let alone.'" *Brock*, 223 F.2d at 685 (quoting *Olmstead*, 277 U.S. 478). This court has also held that "peering in the window" can amount to an invasion of the curtilage when the "trips to the window [are] made at a time when [the officer] lacked probable cause." *Texas v. Gonzales*, 388 F.2d 145, 147 (5th Cir. 1968). This maxim is strengthened by *Jardines*, which held that certain activity is permissible under the Fourth Amendment, such as approaching a home and knocking, "precisely because that is 'no more than any private citizen might do.'" *Jardines*, 569 U.S. at 8 (quoting *King*, 563 U.S. at 469). But there must be a customary invitation to act in that way. *Id.* at 9. So, much as "spot[ting] that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police," *id.*, so too certainly would an individual *shining a flashlight* through a window at 2:30 in the morning. Indeed, the lack of evidence corroborating a burglary (and some evidence opposing such a finding) defeats a probable cause finding.

Dean has provided no evidence that an exception to the warrant requirement applies. Without such a showing, Dean cannot defeat the presumption that his conduct violates the Fourth Amendment.

B

The second prong of the qualified immunity analysis requires Bakutis to demonstrate that the law was "clearly established at the time of the defendant's actions." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). The right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A case need not be "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). And the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

The majority improperly focuses on the lack of precedent surrounding "open structure" calls. It is true that "open structure" calls are not commonly found in our caselaw. But that, on its own, does not preclude a finding that the constitutional violation was clearly established, especially in light of the police department's policy to treat such calls as burglaries. *See id.* (stating that a case need not be directly on point). Bakutis relies on *Linicomn v. Hill*, 902 F.3d 529, for the proposition that an officer violates the Constitution by entering an individual's home without sufficient cause. There, the plaintiff had primary custody of his two minor children after he and their mother divorced. *Id.* at 533. The mother, who suffered from mental disorders, had previously falsely reported to the police numerous times that the children were endangered. *Id.* On the day of the events at issue in the case, she called and informed the police that the plaintiff was abusing the children. *Id.* at 534. Officers visited the home but left after receiving no answer. *Id.* Later that night, they returned after the mother again reported a disturbance about the children. *Id.* Upon arriving, they could not gain access

to the home and ultimately announced through the public address system that they would enter regardless of the plaintiff's cooperation. *Id.* He answered the door, informed the officers that the children were asleep and safe, and refused to let anyone in without a warrant, at which point the officers forced entry. *Id.*

A panel of this court found that the officers violated the Constitution but granted qualified immunity because the violation was not clearly established. *Linicomn*, 902 F.3d at 537, 539–40. We noted that "there was a 'disturbance' at [the plaintiff]'s address. But the officers had the burden of proving the existence of the exigency, and *failed to corroborate* [the mother's] call." *Id.* at 537 (emphasis added). The officers failed to "demonstrate that they inquired into the basis for [the mother's] assertion that the children were 'lethargic and sick,' or the circumstances surrounding [the plaintiff]'s possession of the children that day." *Id.* And, importantly, "the officers arrived at [his] house to find a *relatively calm scene outside* with *no external signs of struggle* indicating the need to prevent violence or restore order." *Id.* (emphases added); *see also Von Derhaar v. Watson*, 109 F.4th 817, 828 (5th Cir. 2024) (noting that an officer's entry into a home "was objectively unreasonable after he engaged [the plaintiff] in conversation for a full minute, *and observed no safety threat* that he has articulated to the district court or our court" (emphasis added)).

The majority distinguishes *Linicomn*, arguing that there, the call "raised suspicion that the father was endangering the children, and the police searched the father's home. Yet here, a home intruder cannot burglarize his own home." *Ante*, at 8 (emphases omitted). But this argument is circular: when Dean received this call, he believed there was a criminal entry. And the facts in *Linicomn* are directly applicable to this case, in which the officers (1) failed to further corroborate that the front door of the home was open due

to an active burglary, especially considering (2) the wealth of evidence that no disturbance had occurred.

Other cases demonstrate that officers cannot, without a warrant, walk upon curtilage without a license or some exception to the warrant requirement because curtilage is protected to the same extent as the home. *See, e.g.*, *Jardines*, 569 U.S. at 6, 9. And binding precedent spanning upwards of half a century demonstrates that shining a flashlight into somebody's home violates the Fourth Amendment. *E.g.*, *Gonzales*, 388 F.2d at 147 ("The district court held that the officer's conduct in trespassing on the property *and peering in the window* amounted to an invasion of the curtilage without probable cause to arrest or search. . . . The paramount reason for affirmance is that the conduct . . . constituted an illegal search because his three trips to the window were made at a time when he lacked probable cause to think that narcotics were possessed in the home." (emphasis added)); *Brock*, 223 F.2d at 685 ("To begin with, the agents, when they appeared outside Brock's bedroom window, were in violation of his rights under the Fourth Amendment. Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his 'right to be let alone' as guaranteed by the Fourth Amendment." (quoting *Olmstead*, 277 U.S. at 478)); *see also* *Jardines*, 569 U.S. at 6 ("[T]he right to retreat would be significantly diminished if the police could enter a man's property to observe his repose *from just outside the front window*." (emphasis added)); *Collins*, 584 U.S. at 593 (explaining that a physical intrusion upon the curtilage—which includes the "side garden" and "area 'outside the front window'"—for purpose of gathering evidence "is presumptively unreasonable absent a warrant" (quoting *Jardines*, 569 U.S. at 6–7)).

Granted, these cases may not have involved "open structure" or "silent alarm" trips for officers to investigate. But the prohibition against

entering curtilage without an exception to the warrant requirement is well settled black-letter law. The facts demonstrated here are not the type that require a more specific case on the clearly established prong. *See Mullenix*, 577 U.S. at 12. At this stage of the proceedings, accepting all factual allegations as true, no signs of a disturbance existed after the officers performed their introductory sweep.[5] And yet, they entered the property and peered through a window along the side of the home. There is no doubt that this is unreasonable under our precedent. The facts were sufficiently similar to demonstrate that marching upon one's curtilage violates the Constitution, absent a warrant or exception to the warrant rule.

One final point bears mentioning. Both the majority and Dean argue that, while it is Bakutis's burden to allege the clearly established prong, the district court reversed the burden, instead "reasoning that because the defendant does not cite binding, precedential caselaw that responding to a suspected burglary alone allows an officer to enter the curtilage of a home, that qualified immunity was not warranted." *Ante*, at 8–9 (emphasis omitted). It is true that the district court stated that "Defendant cites no binding authority suggesting that responding to a suspected-burglary-in-process call alone allows an officer to enter the home's curtilage. Defendant's reply merely repeats citations to these cases in which other courts have concluded that burglar alarms are sufficient exigencies to justify the warrantless search of a residence." But this statement is not what the majority or Dean makes it out to be.

A review of the order and its underlying briefing demonstrates that the district court was referring to Dean's failure to prove that exigent

---

[5] Bakutis does not challenge the constitutionality of the initial sweep.

circumstances permitted such an entry.[6] Granted, the district court did not provide much caselaw in support of its finding that a constitutional violation occurred, rather noting that "[Bakutis] adequately alleges that [Dean] searched the home's curtilage without a warrant or justifying exigency." The court cited law, some of which was non-binding, supporting the proposition that a warrantless entry onto curtilage violates the Constitution. But the mere fact that the district court did not fully show its work, especially when Bakutis clearly provided binding precedent supporting his position, should not demand a reversal on the merits. Indeed, the district court was presented with caselaw in support of Bakutis's position. And a review of this caselaw demonstrates that the violation is very much clearly established.

## III

Faced with a well-pleaded complaint, the allegations of which we are compelled to accept as fact, the majority looks past Supreme Court precedent to expand the community caretaking exception and reframe it with standards below those applied to criminal defendants. I see no reason to splinter the Fourth Amendment into two analyses—one in criminal contexts and another in community caretaking—in contradiction of established law. Because Dean searched Jefferson's property without a warrant, and without satisfying any exception to the warrant requirement, Dean is not entitled to qualified immunity. I respectfully dissent.

_____

[6] Before the district court, Bakutis provided various cases supporting his argument that intruding upon an individual's curtilage violates the Constitution absent some exception to the warrant requirement. He highlighted that Dean "failed to raise any argument which demonstrates exigency and his Motion should be denied on this ground alone." But, as the district court recognized, Dean's citations regarding exigent circumstances were distinguishable. There was no indication of an ongoing burglary.